IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW LOREN COOK,

                Petitioner,                              No. CIV-S-02-2240 LKK GGH P

        vs.

ANTHONY LA MARQUE,

                Respondent.                          FINDINGS AND RECOMMENDATIONS

_____/

*Introduction and Summary*

        In his petition for writ of habeas corpus, petitioner raises two issues, (1) a <u>Batson</u>[1]
violation; and (2) a jury misconduct issue.  As to the former issue, the crux of the dispute has to
do with the trial (and appellate) court's factual findings that the prosecutor's articulated reasons
why several African-American potential jurors were struck were not a pretext for discrimination.
The latter issue, more correctly described as co-defendant misconduct observed by a jury
member, is strictly a legal issue based upon undisputed facts.

        In considering the well briefed positions of both parties, the undersigned finds that
the petition should be denied.

_____

        [1]  <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986).

1

*General Background*

The issues in this case do not initially depend on the facts of the case; the court will give only a very limited background. Where necessary, the court has expanded upon the facts in several sections.

Petitioner was convicted of, inter alia, murder and attempted murder. The prosecution theory was that petitioner, and others, planned a retaliatory murder for the pistol whipping which one of the victims had imposed on petitioner. The defense theory implicated a co-defendant who pled and testified for the government. This co-defendant assertedly masterminded the murder and attempted murder as a result of a drug deal gone sour. Importantly, petitioner directly, and the co-defendants by inference, attempted to convince the jury that no defendant was present at the scene of the crime.[2]

Petitioner is serving a life sentence and a consecutive 25 years to life sentence.

*Standards of Review*

Batson recognizes as structural error the use of peremptory strikes for purposes of dismissing jurors on account of race, and as evolved in subsequent decisions, gender and other immutable characteristics. Courts are required to apply a formulaic analysis when the defense makes a Batson challenge:

> Those three Batson steps should by now be familiar. First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U.S., at 93-94, 106 S.Ct. 1712 (citing Washington v. Davis, 426 U.S. 229, 239-242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S., at 94, 106 S.Ct.

---

[2] On a logistical note, respondent has submitted a transcript which is lined through at many significant points. Evidently, counsel or a paralegal, either on direct review or in this habeas action, "magic marked" passages she thought to be significant; however, when recopied, the passages become nearly impossible to read. Respondent's counsel will please find a way to communicate this to all in the Attorney General's Office. Henceforth, the undersigned will simply order a complete refiling of an unmarked transcript.

1  1712; see also <u>Alexander v. Louisiana</u>, 405 U.S. 625, 632, 92 S.Ct.
   1221, 31 L.Ed.2d 536 (1972). Third, "[i]f a race-neutral
2  explanation is tendered, the trial court must then decide ... whether
   the opponent of the strike has proved purposeful racial
3  discrimination." <u>Purkett v. Elem</u>, 514 U.S. 765, 767, 115 S.Ct.
   1769, 131 L.Ed.2d 834 (1995) (per curiam).

4

5  <u>Johnson v. California</u>, __U.S.__, 125 S. Ct. 2410, 2416 (2005).

6              As will be seen from the procedural discussion below, the third prong of the test

7  remains at issue, i.e., whether the prosecutor's explanations were but a pretext for discrimination.

8  The state court's determination of this issue is one of fact, <u>Hernandez v. New York</u>, 500 U.S.

9  352, 364, 111 S. Ct. 1869 (1991), entitled to "great deference." <u>Id.</u>, 111 S. Ct. at 1868.

10 Realizing that reviewing courts are at a disadvantage when reviewing the cold record in weighing

11 such things as the prosecutor's credibility, the habeas court may overturn the "presumed correct"

12 factual findings only when petitioner presents clear and convincing evidence. 28 U.S.C. §

13 2254(e)(1). <u>See</u> <u>also</u> <u>Miller-El v. Dretke</u>, 545 U.S. 231, 125 S. Ct. 2317 (2005). While "clear

14 and convincing" is more than a close preponderance of the evidence, precisely what is clear

15 and/or convincing is that which appears so to the reviewing judge.

16             However, a reviewing court does have tools by which to judge the state of mind of

17 the prosecutor – tools which include comparative juror analysis, prosecutor's exaggeration of

18 juror answers, prosecutor's incorrect memory, reliance on seemingly trivial juror attributes. That

19 summation of the law is given in the next section.

20             The second issue of juror misconduct simply involves application of the

21 undisputed facts to clearly established law as set forth by the United States Supreme Court.

22 In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined

23 the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of

24 the opinion constitutes the majority opinion of the court. There is a dichotomy between

25 "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable

26 application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two

                                          3

1   situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a

2   point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court

3   case, i.e., on point factually, yet the legal result is opposite.

4           "Unreasonable application" of established law, on the other hand, applies to

5   mixed questions of law and fact, that is, the application of law to fact where there are no factually

6   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

7   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

8   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

9   deference is not blindly automatic, "the most important point is that an *unreasonable* application

10  of federal law is different from an incorrect application of law....[A] federal habeas court may not

11  issue the writ simply because that court concludes in its independent judgment that the relevant

12  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

13  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

14  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

15  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

16  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

17          The state courts need not have cited to federal authority, or even have indicated

18  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

19  Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

20  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

21  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

22  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

23  established Supreme Court authority reviewed must be a pronouncement on constitutional

24  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

25  binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

26  \\\\\

1    A legal summary of what constitutes juror misconduct will be given in that

2    section.

3    *The Batson Issue*

4        Procedural Facts – Batson Issue

5    The precise reasoning given by the prosecutor for using peremptory strikes against

6    African-American jurors is given exhaustively below, but the outline of the dispute copied from

7    the opinion of the Third District Court of Appeal (Blease, J) is as follows (with bracketed

8    material added)[3]:

9        In the course of jury selection, the prosecutor used six of his 25
         peremptory challenges to excuse prospective jurors who were
10       African American.  Counsel for defendant Gains [a co-defendant]
         moved for mistrial under *Batson/Wheeler*.  The trial court found no
11       pattern of discrimination, but agreed to reconsider the matter at a
         future time upon request.

12

13   [As everyone would agree, the trial judge used an improper standard for judging the prima facie

14   case on this day.  The trial judge relied on the fact that because two African American jurors

15   remained on the panel, and that this percentage was greater than the percentage of African

16   American jurors in the community, no pattern of racial exclusion had been presented.  See RT

17   1440-1441.  However, this error is of no consequence, as the trial judge later reflected on his

18   error, and ultimately found that a prima facie case of exclusion existed.]

19       The following day, the prosecutor exercised a challenge against a
         seventh African American juror, after the defense had excluded the
20       remaining two African American jurors whom the prosecutor had
         passed on.  Counsel for defendant Gains renewed his motion for
21       mistrial under *Batson/Wheeler*, joined by the other defendants.
         The trial court found the defense had established a prima facie case
22       and required the People to give a statement of reasons for his
         exercise of seven peremptory challenges.

23

24   \\\\\

25

26   [3] The opinion was partially published on a state law issue not pertinent here.  See 91 Cal.
     App. 4th 910, 11 Cal. Rptr. 2d 204.

5

1    Pretext in a Batson Challenge

2            A reviewing court does have tools to ferret out legitimate non-discriminatory

3    concerns and those reasons which constitute a pretext for discriminatory challenges.  Again,

4    however, the analysis of the undersigned does not simply substitute for that of the state courts.

5    The analysis herein can only be beneficial to petitioner if it demonstrates that the state courts

6    "clearly erred" in their factual determinations.

7            Reasons articulated by the prosecutor may be problematic on their face, e.g.,

8    challenging a person because he lives in a "bad" area (known to be inhabited predominantly by a

9    particular race or ethnicity).  Or in giving an explanation, a prosecutor may exaggerate the juror's

10   statements, or may incorrectly characterize them.  A court should examine the manner in which

11   the prosecutor questioned the members of a certain race as compared to another race, or whether

12   an ambiguous juror statement was never made the subject of attorney voir dire (assuming such

13   was allowed).  Statistical disparities (or non-disparities) are important.  See Miller-El, 25 S. Ct.

14   at 2337.  The complete absence (or presence) of a reason for striking that would make sense to

15   normal prosecutors is important in the analysis.  Finally, "[m]ore powerful than these bare

16   statistics, however, are side-by-side comparisons of some black venire panelists who were struck

17   and white panelists allowed to serve.  If a prosecutor's proffered reason for striking a black

18   panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is

19   evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."

20   Miller-El, 125 S. Ct. 2317, 2325.

21           Most of the analysis of pretext involves a look at the individual jurors; however,

22   cumulative tendencies that bespeak a certain state of mind are important as well.

23           The undersigned finds fault with the analysis of the Court of Appeal in that no

24   comparative analysis of jurors was utilized in its analysis.  As briefed above, comparative

25   analysis is often the most useful form of pretext finding.  At the very least, the court should have

26   analyzed the comparative feature of jurors if only to ultimately reject the comparison.  Relying on

6

state law, the Court of Appeal completely discounted such an approach.[4]  While "overeagerness

to serve on a jury," for example, may well be a legitimate ground upon which to exercise a

challenge, the real proof of whether such a legitimate articulation could be but a pretext for

discrimination may well depend on the consistency of a challenge to other jurors who present

that same attribute.  Moreover, the Court of Appeal never really hit the crux of the matter – was

the prosecutor's assertion exaggerated or fair?  Did the prosecutor's voir dire questions on the

issue fairly try to clear up ambiguities, or did the prosecutor seek to insert ambiguity into another

unambiguous record?  Questions of this type were not resolved by the Court of Appeal.  Rather,

the Court of Appeal in its analysis herein would just recount the prosecutor's articulations of

reasons, and the analysis would end, for the most part, with whether the stated reasons were valid

on their face.  This analysis is more akin to Step 2 in the Batson analysis where the articulation of

non-discriminatory reasons is at issue.  "The Johnson Court further noted, citing our decision in

Paulino, 371 F.3d at 1090, that it 'does not matter that the prosecutor might have had good

reasons[; W]hat matters is the real reason [potential jurors] were stricken.' 125 S.Ct. at 2418."

Williams v. Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006).  "Accordingly, to rebut an inference

of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must

do more than indicate that the record would support race-neutral reasons for the questioned

challenges."  Id.  Thus, the opinion of the Court of Appeal is only of limited value.

The undersigned finds some fault with the comparative analysis of petitioner as

well.  Petitioner essentially argues that if the prosecutor articulated a reason for challenging a

juror of color, he must challenge all jurors who have a similar reason to be challenged.  However,

the reasons for challenging, or not, are very multifaceted, and "detriments" in one area might

well be ameliorated or exacerbated by attributes in other areas.  While the comparative analysis

should not demand "cookie-cutter" uniformity before a prosecutor's stated reasons may be found

---

[4]  The trial court did not engage in such an analysis either, although the ability to
instantaneously perform such an analysis in the throes of selecting a jury is somewhat unrealistic.

1  pretextual, <u>Miller-El</u>, <u>supra</u>, neither should the opposite unreasonable tactic be relied upon, i.e.,

2  ignoring stark differences among the jurors aside from the one attribute being compared.

3         The Prosecutor's Stated Reasoning; Petitioner's/Respondent's Observations; State Court

4         Reasoning; the Undersigned's Resolution

5               Juror Reynolds

6               The prosecutor excused this juror based on the juror's responses on a

7  questionnaire and his appearance in court.  However, the greater weight was placed on the

8  written responses because the prosecutor believed the written responses to be more candid.  The

9  prosecutor asserted that Reynolds was too eager to serve and improperly groomed (wearing a tee

10  shirt).  Reynolds was focused on the race issue as he had written that "black people have died for

11  this opportunity [to sit on a jury]."  Reynolds had made reference to the OJ case in that it

12  indicated to him that it pays to have wealth – indicating to the prosecutor that the juror would

13  have sympathy for defendants who did not have wealth.  The prosecutor thought that Reynolds

14  would not pay attention to circumstantial evidence as he had responded on the questionnaire that

15  he believed people were in jail based on circumstantial evidence.  The prosecutor asserted that

16  Reynolds had stated that he "would not follow the law."  Reynolds was challenged *primarily* on

17  the basis of his views on circumstantial evidence.  <u>See</u> RT 1741-1745.

18               The trial court did not analyze the challenged jurors one-by-one.  Rather, the trial

19  court gave a lengthy general analysis of the difficulty in making a factual pretextual

20  determination, but did conclude:

21               I find in each case that Mr. Steed has given an adequate basis for
                 him doing so [exercising challenges].  I will, as I pointed out
22               earlier, in some of them having been challenged, he brought out a
                 dozen things that were factors in each case, normally emphasizing
23               one or two that were the important ones, the triggering ones, and
                 the others just along the way were factors one might consider.
24  RT 1853.

25               The state appellate court found the prosecutor's reasoning on its face passed

26  muster citing several state cases along the way.

8

1          Petitioner observes that the questionnaire specifically sought out responses to race

2     questions.  Mr. Reynolds was not overly focused on race as judged from the voir dire answers

3     when viewed in their entire context:

4     [Questioning by Defense Counsel Rocha]:

5                    Q.  Mr. Reynolds, let's commence with you.  Do you not want to
              be here?
6                    A.  Yes, I want to be here.
              Q.  And why is that?
7                    A.  Well, first of all, I have never been a juror, and I think that
              being a black person, a lot of people have died for me to get this
8              right of all colors, not just black people, so I'm honored to be here.

9     RT 870.

10    Petitioner contests the prosecutor's rationale that Reynolds was "overeager" to serve, comparing

11    the non-stricken Juror 11 who desired to serve despite a personal hardship.  The "OJ Simpson"

12    comment was discounted in that the questionnaire specifically asked for it, and the prosecutor's

13    inference drawing that the "wealth" comment would favor defendants was incorrect.  Petitioner

14    lastly attacked the prosecutor's reliance on the "circumstantial evidence" comment generally

15    noting (without support) that many jurors had indicated a misunderstanding of the law, and that

16    such misunderstanding would be cleared up by instructions.

17         The undersigned agrees that the prosecutor's "focus on race" and "overeagerness"

18    could be viewed as a bit stretched when reviewing this matter with the aid of the actual words of

19    the transcript.  As petitioner notes, citing Batson, the prosecutor cannot simply use the fact that

20    African Americans may be sensitive to race issues to justify a strike.  However, the prosecutor,

21    apparently, did not have the voir dire transcript available for review; all he had in giving the

22    judge an explanation was an impression of the witness from memory.

23         If "race sensitivity" had been the only or primary reason expressed by the

24    prosecutor, petitioner would be on the way to a winning Batson analysis.[5]  But of singular

25    ───────────────

26         [5]  However, petitioner's comparisons with sitting jurors, see Amended Points and
      Authorities at 17, miss the point.  These comparative jurors were making academic statements

1   importance is that the prosecutor expressly, "*primarily*" relied on the circumstantial evidence

2   answer on the questionnaire.  Reynolds had great doubt about the usefulness of circumstantial

3   evidence.  In this respect, the prosecutor was spot on, and most tellingly, Reynolds expressly

4   indicated on his questionnaire, after being given therein the typical instruction on the valid use of

5   circumstantial evidence, *that he would not follow the rule of law that circumstantial evidence*

6   *could be relied upon*.  Supp. Clerk's Transcript at 12.  The red flag raised by this comment belied

7   any notion that this juror could be convinced to consider a body of evidence that is often

8   otherwise very persuasive.  Whether or not this very opinionated statement could later be

9   overcome with more instruction, as petitioner speculates, the prosecutor had a very legitimate

10  concern at this juncture that this juror would impose a nothing-but-direct-evidence standard on

11  the prosecution.  More importantly, if a juror had expressed that he would not follow the law in

12  this one area, what other areas might the juror not follow the instructions because he disagreed

13  with the law?  Any reasonable prosecutor would challenge this juror.  The state courts did not

14  clearly err in assessing that there existed a very legitimate reason for challenging this juror, and

15  the undersigned finds from the record that the prosecutor actually based his decision to challenge

16  on this basis.[6]

17  <u>Juror Livingston-Blanks</u>

18          The Court of Appeal at p. 20-21 of its opinion accurately characterized the

19  reasons set forth by the prosecutor, and that summation is repeated here:

20          The prosecutor gave numerous reasonable justifications for
        excusing Ms. Livingston-Blanks.  We therefore discuss only the
21      main ones.  First, Mr. Steed stated that Ms. Livingston-Blanks'
        employment with Sacramento County in the Department of Human

22

23  that racism still existed in this world.  This is a much different issue and perspective from one
    who believes himself to be a victim of racism.  The sensitivity which concerned the prosecutor
24  arose from the victim's purported hypersensitivity to race issues *because* of the perceived victim
    status.
25

26      [6]  Moreover, the fact that this juror wore a tee shirt to court smacks of poor judgment on
    the part of the juror.

Services and Child Protective Services and some of her other answers indicated she might be one who has a liberal viewpoint and is more inclined to be sympathetic to the defense especially because of the young age of the defendants....

Second, the prosecutor stated that the fact this juror's brother was a murder victim might affect her ability to be a juror in this case, especially because she hesitated in her response to the court when questioned on this issue....

Third, the prosecutor stated his most important reason for excusing this potential juror was her statement she was the victim of spousal abuse and of "false arrest."  The prosecutor believed the juror's use of the term "false arrest" implied she had negative feelings toward law enforcement and the district attorney's office, and in fact, she cited the false arrest and spousal abuse as instances where she had a bad experience with law enforcement....

Moreover, after looking into the matter of the alleged "false arrest," the prosecutor learned that Ms. Livingston-Blanks had misled the court because in fact she had been arrested for spousal abuse and the matter was deferred upon entry of a guilty plea.  She also falsely characterized herself as the victim of these two crimes when she was the offender, not the victim.  The prosecutor felt these answers reflected negatively on her character and her integrity...

Again, the Court of Appeal looked at the reasons on their face and concluded that the reasons as stated were valid in the abstract.

Petitioner tries hard to poke holes in the prosecutor's reasons, but ultimately the attempt fails.  First, petitioner demonstrates that the prosecutor did not strike Alternate 3 who was a licensed social worker, nurse and nun.  Also, the prosecutor did not strike Juror 6, whose brother-in-law had been murdered.  Petitioner then picks at the spousal abuse and false arrest reasons by attempting to justify the grammar used, and by asserting (without support) that Livingston-Blanks had actually been the victim of her drug-using ex boyfriend.  Finally, petitioner believes that the prosecutor's above and beyond investigation of this juror (as well as one other black juror) outside the confines of examination, demonstrated his intent to make a case to excuse black jurors whenever he could.

\\\\\

One could question the strength of petitioner's criticisms.  Petitioner points to one attribute of comparison without reflecting on the whole of the jurors compared.  That is, none of the compared jurors had misrepresented facts to the court.  Moreover, Alternate 3, who would probably never get to rule on the case, was not really similarly situated to a juror who, if not struck, would certainly rule on the case.  Also, finding one inconsistent application of the prosecutor's stated reasoning is not that persuasive.  While petitioner's assertions are colorable, they do not make for "clear and convincing" evidence.  But most importantly, this juror is similar to the previous one in that no matter how one would ultimately assess the criticisms, the fact that the prosecutor could reasonably believe from the facts given that this juror had misled the court is such a strong, valid reason that it outweighs by far all of the criticisms.  No reasonable prosecutor would fail to strike a juror who arguably misled the court as to the facts of her personal criminal experience.  This juror was likely prejudiced against the prosecutor's side of the law enforcement equation, and the undersigned finds the prosecutor sincere in this respect.

<u>Juror Singleton</u>

Mr. Singleton first came to the attention of the prosecutor for a possible strike because of his age (69) – the prosecutor wanted an age balance, but the prosecutor immediately discounted such as a reason for exercising the strike.  RT 1749.  The first real concern was that the juror stated he had three adult children but did not know of their present whereabouts.

This indicated to the prosecutor: "That is a concern to us in terms of his stability, his social make-up within a community, and how he might interact with the other jurors.  Being a parent myself, I find this very – this is very troubling to me, that a person would define them in a position where he either didn't care about his children, I think one could draw that inference.  It concerns me a great deal."  RT 1749.

Next, the prosecutor believed his questionnaire indicated that law enforcement testimony was "self-serving," [Actually, the questionnaire stated "some times they can be self-serving."]  "That's an immediate problem for me."  RT 1750.

Third, the prosecutor believed that some of Singleton's responses suggested that because Singleton had experienced prejudice, he believed himself to be a race victim, and, according to the prosecutor "[t]hat is racist." RT 1795.[7]  The "most troubling" aspect to the prosecutor was Singleton's court martial for domestic problems.

The next "most troubling" [the prosecutor used this phrase twice] Singleton attribute was his response to question 48 having to do with bad experiences with law enforcement: "I was arrested once for something only because I was with a woman of another race."  The prosecutor stated:

> He perceives himself further, this race issue goes further.  He sees himself as a victim of police misconduct in that he stated he was arrested once for something only because "I was with a woman of another race."  That's a very troubling response.  I'm not saying it didn't occur.  I'm stating for a man from Alabama, that's where he is from, to make that statement, I think places the Government in this case, who has to produce law enforcement officers, and seeks credibility, that places me in a situation where he may be inclined to be sympathetic and leaning toward the defense in this case in light of the race of the two defendants.
> ....and it seemed to me he was very emotional when he responded in court.  When you asked him about that, he was emphatic about that, certainly he was troubled by that...

RT 1751-52.

Importantly, in the next question (Do you think this experience might cause you to be unfair to either side in *this* case?), Singleton answered, "Yes."  Although Singleton later sought to move away from this response in voir dire, the prosecutor believed the questionnaire response was the more forthright.  RT 1753.

Again, the Court of Appeal's response is not helpful for the most part in that it merely reiterated that a bias towards law enforcement was a legitimate grounds for a strike; it did not reach the issue of whether the prosecutor actually believed such was the case here, or

---

[7]  The questionnaire posed the question – "Would you say that you were raised in an atmosphere free of prejudice?"  Singleton answered "No," and explained: "I am a black man in America."

conversely, whether the stated reason, valid on its face, was but a pretext for discriminatory animus.

Petitioner contests this strike on the primary basis that the prosecutor, not Singleton, was preoccupied with race issues.  Petitioner points out that the answer that a black person growing up in the south during the 30s and 40s believed himself to be a victim of discrimination (an indisputable fact) is hardly grounds to say that Singleton was preoccupied with race.  Moreover, believing that he was arrested on racial grounds, and that he remembers the unfairness of the arrest, again, is hardly grounds for believing that Singleton was so preoccupied with race that he would be anti-law enforcement.  Petitioner also faults the prosecutor's determination to strike Singleton because of his age pointing out that there was no age imbalance on the jury, and if anything, Singleton would have balanced the panel further.[8]  Also disapproved by petitioner was the prosecutor's reliance on Singleton's lack of contact with and knowledge of his grown children as other jurors were not questioned about their relationships with their children.

Petitioner cannot win the Singleton battle.  While it is true that, when viewing Singleton's statement about his being a victim of discrimination in the abstract, the prosecutor may have had too much race on *his* mind, the response cannot be viewed in isolation from Singleton's other comments.  Having written in his questionnaire that he thought the racial arrest would cause him to be unfair, Singleton effectively precluded himself from serving on the jury. The prosecutor could well have been correct, given the *entirety* of Singleton's responses, that for good reason or otherwise, Singleton remained too sensitive to his bad experiences to serve on the jury.  No prosecutor would be compelled to accept at face value any verbal retractions which may well have been an attempt to cover-up what may have appeared to be an embarrassing statement. \\\\\\

---

[8] However, the prosecutor said age was not a deciding factor.  RT 1749.

1            Juror Tillman

2            In a lengthy explanation about Juror Tillman (perhaps too lengthy), the prosecutor

3  first mentioned that he thought this juror may have been related to the Tillmans who ran a bail

4  and investigation agency.  Although the record is not clear on the point, the court understands

5  that such was not the case, and through his investigation, the prosecutor understood this as well.

6            The prosecutor found fault with Tillman because he opined in the questionnaire

7  that law enforcement is not always truthful.  Tillman also related that his brother had shot

8  someone in self-defense, and the prosecutor termed this a "serious problem" for him, perhaps on

9  account of the facts of the case he was about to try.  The prosecutor was concerned that Tillman

10 had not reported his own arrest for DUI on the questionnaire, and that he had not reported that his

11 girlfriend had recently assaulted him, for which a police report had been created (response to

12 question about whether he etc. had been a victim of a crime).  The prosecutor went on to say that

13 Tillman's response to a question about witness believability – people will tell the truth simply

14 because they take an oath – indicated to the prosecutor an inability to discern lying under oath.

15 The prosecutor (somewhat incredulously) believed Tillman would be an inflexible juror simply

16 because he reported in his questionnaire that he would change his position if he could see the

17 other juror's views.  The prosecutor also thought Tillman to be inflexible because in answer to a

18 question about why Tillman could be a fair and impartial juror he reported he could look at a

19 "picture" and make up his own mind about what the "picture" represented.  The prosecutor was

20 finally concerned that Tillman's aunt had been arrested for drug use (crank).

21           The Court of Appeal thought the strike to be well placed because of Tillman's

22 failure to report a crime, and his "mistrust" of law enforcement officers.

23           Petitioner does not mention the fact that Tillman had not reported his own arrest

24 and the fact that he had been a victim of an assault crime, but assails the prosecutor's reasoning

25 on the issue of "inflexibility" and judging a witness' credibility.

26 \\\\\

The prosecutor would have been well served to stop his explanation after voicing the legitimate concerns that the juror had apparently not been truthful about his arrest record or his crime victim status.  Jurors who are not honest in some particulars may well be hiding other facts pertinent to the voir dire process, e.g., grudge against the criminal justice system and the like.  However, the prosecutor rambled on, and in the process seemed to be "protesting too much" about his reasons for striking the juror.  Saying that one might change his mind after taking a hard look at the views of others is the antithesis of inflexibility.  Moreover, saying that law enforcement may not tell the truth all the time hardly bespeaks a mistrust of law enforcement.[9]  A statement that law enforcement is *always* truthful is absurd.  Case books are full of situations where law enforcement personnel were not truthful.  Rather, the statement can only be construed as a statement on the part of Tillman that he would scrutinize all testimony.  The prosecutor's statement that he thought witnesses would be deterred from lying because they might fear perjury repercussions is rather a stretched reason for striking a juror.  Finally, as petitioner points out, many other jurors had criminal justice problems such that the aunt's arrest for drug usage is hardly unique.  The prosecutor did not endeavor to ascertain whether this experience had any real meaning to Tillman such that he could not be a fair juror.  Finally, the prosecutor's reference to Tillman's brother having shot someone in self-defense applied to juror Watkins.  It is unclear from the record whether this confusion was ever corrected in the prosecutor's mind when discussing the Tillman strikes, see RT 1755.

Exaggerating or "making stuff up" can show a discriminatory animus on the part of a prosecutor.  The court balances the prosecutor's latter comments with Tillman's arrest record and victim omissions. The prosecutor's stated primary reasons for striking Tillman were legitimate, and the undersigned finds that the prosecutor held these beliefs not out of pretext but

---

[9]  In addition, the questionnaire asked whether the juror would think that police testimony was necessarily more truthful than a civilian's testimony.  Tillman said no and explained, "They [police officers] are still human."  Saying that this response shows a mistrust of law enforcement is "making stuff up."

1  because they were in fact his beliefs.  See RT 1758.  On balance, although it is close, the court

2  finds insufficient "clear and convincing" grounds to believe that the striking of Tillman was

3  substantially based on race.

4                    Juror Watkins

5                    Ms. Watkins, like Juror Tillman above, was challenged for reasons which

6  unequivocally would be justified, but also for reasons which were insubstantial.  However,

7  because the prosecutor actually challenged this juror for cause, as a result of her brother's

8  problems with the criminal justice system, the court finds the prosecutor's primary motivation for

9  utilizing a peremptory against this juror to be bona fide.

10                    The prosecutor challenged juror Watkins because her brother had been involved in

11  a shooting in which he asserted self-defense.  Evidently this defense was unsuccessful, and

12  Watkins' brother was sentenced to prison.

13              That he was prosecuted and he went to prison for 7 years, she
            believes it was self-defense, the inference being he was wrongly
14              convicted, thus, not only has law enforcement wrongly arrested her
            brother, but the fact her brother had to do seven years in prison for
15              a crime she feels he was not responsible for, that in and of itself
            excludes her, from our point of view.

16  RT 1759.

17  The prosecutor then went on to surmise that perhaps this experience made her feel that African-

18  Americans were not treated fairly, or that an "inward" bias had resulted.  However, the

19  prosecutor went on to say that "the whole scenario" excludes her, from our point of view.  Id.  In

20  connection with this reason (and not in a vacuum as petitioner argues) the prosecutor quoted her

21  questionnaire response that Watkins indicated that she had problems with the criminal justice

22  system, but she was "not sure" what they were.

23                    The prosecutor also stated that the witness had indicated bias in her judgment of

24  law enforcement testimony from her response that both law enforcement and civilians were not

25  always truthful.  Her work as an accounting clerk with a law firm bothered the prosecutor (this

26  last reason was said to be non-controlling).  That one or more of Watkins' friends smoked

                                    17

1  marijuana added to the prosecutor's list (although there might not be many jurors in California

2  who could serve if having an acquaintance who smoked marijuana would disqualify one from

3  jury service).  The prosecutor finished up with Watkins' statements indicating that a long trial

4  would put work pressures on her, and she indicated that she did not want to serve for a long trial.

5         The court will not list all the factors of petitioner's precise argument, as they are

6  obvious.  Clearly, the prosecutor's assertion that because Watkins thought both law enforcement

7  and non-law enforcement could be untruthful, she therefore disfavored law enforcement

8  testimony is a non-sequitur and strained.  Being an accounting clerk in a law firm is insignificant

9  from the point of view of possible bias against the prosecution's case.  The fact that she knows

10  marijuana smokers does not say much, if anything, tangible about this juror.  Finally, the juror's

11  stated reluctance to sit for a long trial is insignificant.  Any working juror would have to feel torn

12  about the duties owed to one's employer or profession and the duty to sit as a juror.  Petitioner

13  cites to other jurors not struck by the prosecution who had this ordinary conflict.[10]

14         Also problematic is the prosecutor's inferential presumption that because Watkins

15  thought her brother wrongly convicted, it might mean that she would be race conscious in her

16  deliberation if chosen to be a juror.  As petitioner asks, why would a perceived wrongful

17  conviction necessarily, or even probably, involve racial issues.  Who has race on the mind,

18  Watkins, or the prosecutor?

19         However, this inferential presumption was only one of the inferences to be drawn.

20  As the prosecutor stated, the overriding inference is that this juror might have an ax to grind per

21

22        [10] Also, the prosecution is somewhat inconsistent in this reasoning.  If the juror does not
   seem to mind the time imposition, that juror is "overeager."  See Reynolds, above.  If the juror
23  does have problems with the time-to-serve factor, she won't pay sufficient attention during the
   trial being preoccupied with the personal concerns.  The prosecution can't turn every factor into
24  one that always points to a reason for challenging no matter what the response.  This is not to say
   that a juror who voiced a grave concern about the hardships entailed in being a juror would not
25  be subject to peremptory challenge, see Juror Maxey below; however, the rather ordinary
   statement that a long trial will cause problems would seemingly not be a valid basis for
26  challenge.

se with law enforcement with this juror voting "not guilty" to rectify in her mind, in the only way possible, the perceived injustice done to her brother.  There is no doubt from the emphasis placed on this factor by the prosecutor, as is evident in the record, along with the juror's own statements that she had certain, but indecipherable, problems with the criminal justice system, that the prosecutor's actual state of mind focused on this factor and not race.  If the prosecutor felt strongly enough to challenge this juror for cause because of this one factor, it stands to reason that in exercising the peremptory challenge, this factor was by far the one which weighed in the prosecutor's mind.

Juror Parker

The prosecutor's main reasoning to strike this juror involved her not being employed outside the home, her stated unwillingness to determine one's state of mind from circumstantial evidence, and the fact that she disapproved of accomplice testimony (initially noting that the questionnaire response was left blank, and then indicating to defense counsel that she disapproved of the practice).

The prosecutor stated other reasons for not liking this juror (none of which expressly had to do with racial notions) with which petitioner takes issue.  However, because the record does indicate that the prosecutor was actually concerned with the above non-racial factors, the fact that he might be arguably "wrong" with his concept that homemakers do not have sufficient social interaction to be good jurors, or that some other retained jurors had trouble with the concept of understanding accomplice testimony, does not prove a racial predisposition on the part of the prosecutor.

The record demonstrates that the prosecutor actually held a legitimate basis for exercising a challenge against Juror Parker.

Juror Maxey

The prosecutor utilized his challenge against this juror on account of her hardship request (this juror actually made a hardship request to the court which was denied); her

1   "addiction" to the O.J. Simpson trial in which she learned that not all law enforcement was

2   honest, and her exposure to an alleged excessive force by police incident.

3   　　　　This juror actually thought enough about her hardship to make an actual request to

4   the court.  Unlike the Watkins' situation in which common, generalized notions of hardship were

5   noted, a good attorney will take notice of jurors who have gone so far as to request to the court

6   that they be excused.  Juror Maxey had just started a new job and was concerned that a long

7   absence would be inimical to her employment interests.  Such a juror may be unduly impatient

8   with the sometimes tedious court process, and might be quick to form concrete opinions in order

9   to short circuit the deliberative process.  Her fascination with Court TV, and especially the O.J.

10  trial, would place a prosecutor on notice that a juror may have become wedded with pre-trial

11  notions of law enforcement miscues and the like.  Finally, a prosecutor could be concerned with

12  an anti-law enforcement bias borne from this juror's perceived exposure to an excessive force

13  incident.

14  　　　　In short, although petitioner can point to some empaneled jurors who had one of

15  the attributes exhibited by this juror, the combination of legitimate "problems" for Juror Maxey

16  convinces the undersigned that the prosecutor was bona-fide in the exercise of challenge against

17  this juror.

18  　　　　Macro Aspects

19  　　　　The undersigned has noted the overall statistics involved in the striking of

20  African-American jurors.  While seven strikes of black jurors would and should certainly get a

21  judge's attention, and is certainly a factor which may impose an adverse gloss on a prosecutor's

22  explanations, the court also notes that the prosecutor did not challenge, and would have accepted,

23  two black jurors (which ironically the defense struck).  The Ninth Circuit has viewed such a

24  positive point for the prosecution.  "Although discriminatory intent may be inferred from the fact

25  that the prosecutor exercised four of his first twelve peremptory challenges to strike jurors with

26  Hispanic surnames, see Hernandez, 500 U.S. at 363, 111 S. Ct. 1859, at least one

1 Hispanic-surnamed member of the venire was empaneled. This might indicate that the

2 prosecutor's motive was non-discriminatory.  See Turner v. Marshall, 121 F.3d 1248, 1254 (9th

3 Cir.1997)."  Sims v. Brown,  425 F.3d 560, 575 (9th Cir. 2005).

4 But what corroborated the prosecutor's non-discriminatory state of mind, and was

5 especially persuasive to the undersigned in this respect, is that the prosecutor accepted one of the

6 jurors even though this black juror made comments which facially may have permitted a strike,

7 and which in fact, the prosecutor did assert was a reason to strike some of the jurors above.

8 In this case the prosecutor went further than just explaining why he struck certain

9 jurors.  He explained to the court why he accepted the black jurors he did accept.  Especially

10 noteworthy in this regard is the prosecutor's explanation with respect to Juror Green.  This juror,

11 like a few others, indicated that she had been the victim of prejudice because she was African-

12 American.  RT 1768.  Although concerned about this response on account of the potential for

13 using such a feeling to "rectify" that injustice through an anti-prosecution verdict, the prosecutor

14 believed that her other attributes (including her profession, raising a family, having served on a

15 criminal jury before which reached a verdict) made this juror a leader, and one who could and

16 would sort through the evidence in an appropriate manner.  If the prosecutor were simply looking

17 for an excuse to strike black persons, he would have done so, and would have thought that he had

18 a facially plausible reason for so doing.  He did not, and his action is not compatible with the

19 argument that the prosecutor had the mindset of using strikes simply to get rid of black jurors.

20 Additional Consideration

21 At one point, the Court of Appeal, in reviewing the challenge to Juror Watkins,

22 declared: "A peremptory challenge must be upheld unless it is based 'solely' upon group bias.

23 (Wheeler, supra, 22 Cal. 3d at pp. 278-281).  Thus, even assuming the prosecutor took this

24 juror's beliefs too far [turning a racially neutral answer into a racially motivated answer], the

25 experience clearly left her with a negative view of the criminal justice system which is a

26 legitimate basis for exercising a peremptory challenge."  Opinion at 25 n.12.  The court can find

no basis in the holdings of the United States Supreme Court for the holding that discrimination

must be the sole factor guiding the prosecutor's actions before a <u>Batson</u> challenge will be upheld.

And, based on the Supreme Court cases cited above, the undersigned finds this legal holding to

be an unreasonable application of established Supreme Court authority.

However, it is not true either that *any* discriminatory animus, no matter how

inconsequential in the decision to challenge a juror, will require the vacation of a criminal

conviction.  The undersigned has found petitioner has not shown by clear and convincing

evidence that the prosecutor in this case offered non-credible, pretextual explanations which

actually directed his use of peremptory challenges, i.e., that his challenges were motivated by

racial animus.  However, to the extent that one could argue that there was *some* discrimination

involved in the challenge of seven black jurors, the undersigned would find that if respondent

could demonstrate that the challenge would have been made even in the presence of some

discriminatory mindset, the <u>Batson</u> challenge would ultimately fail.  The undersigned adopts the

reasoning set forth in <u>Kesser v. Cambra</u>, 392 F. 3d 327 338 (9th Cir. 2003) rehearing en banc

granted, 425 F.3d 1230 (9th Cir. 2005) which cited to the uniform rule in AEDPA cases to this

effect across the circuits.  Although <u>Kesser</u> cannot be cited as authority on the subject, given its

en banc pending status, there is no rule which precludes the adoption of its reasoning and that of

the cited cases.  In those cases where the record clearly shows the existence of the valid

challenges for cause, and the record indicates that such reasons were the ones heavily relied upon

by the prosecution, the ability of a petitioner to posit proof of some discriminatory animus will be

insufficient to require retrials.

The basis for this alternative ground of ruling is clear from the record.  Every juror

challenged herein had significant downsides unrelated to race, as set forth in the written

questionnaire, that *any* reasonable prosecutor would probably have used as a basis for challenge.

In such a case, it does a disservice to the criminal justice system to demand a complete purity of

heart of the prosecutor, when any deficiencies therein played a de minimis role in the challenge

1   to the juror.

2   *The Jury "Misconduct" Issue*

3          The alleged "misconduct" occurred when a juror witnessed petitioner's co-

4   defendant Gains tell his attorney, backed up by gestures, that what a witness said about incidents

5   at the murder scene were contrary to the actual facts.  This hurt the defense because petitioner's

6   defense, and inferentially that of his co-defendant, was based on the defendants not being at the

7   scene.  Gains did not testify but presented a defense involving a description of the shooter which

8   was at odds with Gains' description.  Petitioner testified and provided an alibi defense for all of

9   the defendants which included the testimony that Gains and he were watching a movie in a

10  Rancho Cordova apartment at the time the murder took place.[11]  One could infer from the defense

11  of both Gains and petitioner that neither was the shooter and neither was even there at the scene

12  as petitioner had proffered a common alibi.  Of course, Gains' comment about what had actually

13  transpired at the scene indicated to the juror that defendants were, in fact, all too present at the

14  scene.

15         The incident started when the clerk received a telephone message from a juror

16  (no. 12) requesting to speak to the judge.  RT 5273.  When the clerk saw the juror on the next

17  deliberation day, the juror again requested to speak to the judge, but because the judge had been

18  reassigned for the day, the clerk convinced the juror to speak with her.

19             She told me late in the deliberations on Friday, she had shared a
                comment that she had overheard one of the defendants make
20             during the testimony of Jose Gomez to the effect that the
                defendant, who I didn't ask her which defendant, leaned over to his
21             attorney and said, "He's lying," and I don't  remember her exact
                words, but words to the effect of the directions of the people went
22             in at that time, which was contrary to what the testimony had been
                right previous to that....
23
    RT 5274-5275.
24

    ─────────────────────────

25        [11]  The movie watching commenced between 8:00 p.m. and 9:00 p.m.  The murder took
    place prior to 10:00 p.m. (A police officer was on the scene prior to 10:00 p.m.)  The movie
26  would not have been over at the time the murder was committed.

Juror 12 was called in, and placed under oath; she recounted in more descriptive detail what the

defendant had said:

> It was when Gomez was on the stand, and he was saying what
> happened in the back alley, and he had conveyed that Bolds was
> behind him, and that they ran out, and him and Bolds ran out
> across the alley.  And at that time I was looking at the Defendant
> Gains, and he turned to his lawyer, and he said, He's lying. Jose
> and I went this way, and Kenny [Bolds] ran this way.
>
> And at that time he looked over at me, and I believe Mr. McEwan
> looked over at me, and Mr. McEwan nudged him and said, "Write
> it down."

RT 5286.

> Juror 12 related that she had told all the other jurors about what she had

overheard.  She related that the other jurors did not want to discuss it, and collectively said:

> Basically, everyone just said, that's okay, it doesn't matter.  It
> doesn't matter.  We have to base this on the facts and – and
> whether or not she really heard this, or not, it doesn't matter.  We
> have to base it on the facts.  That's also how I felt when I heard it.

RT 5288.

Juror 12 stated that she could follow the judge's admonition to disregard what she had heard,

which was given at some length, RT 5289-5290, "Yes. I actually did believe I could be very

objective, even after I heard it."  RT 5290.  During questioning by the lawyers, Juror 12 did

concede that she had interpreted Gains' remarks as meaning that he had been at the scene of the

murder, RT 5292, although she also conceded the possibility that she might not have heard

everything Gains said.

The court determined to question/admonish all of the other jurors individually.

Counsel had a Hobson's choice – they needed to know whether the other jurors could disregard

the information about Gains' presence, but that questioning would emphasize that fact as well.

For example, Juror 1 indicated that he interpreted Juror 12's information as a concession by

Gains that he was at the scene.  RT 5304.  But Juror 1 said he could disregard such information.

Juror 1 indicated that Juror 12 was admonished by the other jurors for having relayed this

information.

The judge continued in his questioning of every juror.  With the exception of Juror 11, all other jurors were unequivocal about their ability to disregard what Juror 12 had told them.  Most were miffed at Juror 12 for even having raised the issue.  All related that at least some jurors admonished her for bringing the subject up.  Some jurors intuitively determined why they should not consider the information.

Juror 11 initially told the judge in response to his question about whether the information had an impact which he could not disregard:

> To tell you the truth, at the beginning it did, because I went into the jury deliberation room with a wide-open mind, I mean wide open, just looking at the facts.  It [Juror 12's observation] kind of sunk my spirits, and then another juror said to me, it's just what she heard.  We don't know what she heard.  She could have misheard it.  We don't have any explanation.  It becomes hearsay.
>
> And I was able, I worked through it this weekend.  It bothered me for a weekend.  I came back.  I was fine.
>
> ***
>
> I was fine today, yes.  It– I was able to logic it out.  It really didn't matter, it didn't have anything to do with what we were working at.  It wasn't a fact that was offered in evidence.

RT 5346.

Juror 11 later equivocated somewhat in response to the lawyer's questions regarding whether Juror 12's information would have any influence: "I would like to think, no.  I can't tell you for sure.  I would like to think, no.  I would try my best."  RT 5348.  In response to the question: "You can't assure us it would not have some impact as you decide the case?"  Juror 11 responded: "No I can't.  I'm sorry."  Id.

The judge personally admonished every juror as well.  His lengthy, careful admonishment focused on the unreliability of the facts concerning what Juror 12 purportedly heard, and that no juror should rely on such information.  Moreover, the next day, the judge re-admonished the entire jury, and asked the jurors whether anyone had changed his or her mind

1   regarding the potential impact of Juror 12's information.  None of the jurors indicated that they

2   had.  RT 5370-5372.  The trial judge excused Juror 12, and substituted an alternate with

3   instructions that deliberations start anew.  Juror 11 was not excused.

4           In denying the motion for mistrial, the judge found:

5           I was impressed with the responses of the other jurors and the fact
            that there was a general rejection, I think I have mentioned it
6           before, rejection of the validity of this type of evidence, and its
            consideration by the foreperson and others, and there was a general
7           acceptance of that, and the subject was not brought up again, the
            subject was not debated, and it was rejected as inappropriate.

8
            Obviously, if they had proceeded differently and treated it as
9           evidence until someone blew the whistle and discussed it and
            waited, then it would be less and less likely they could effectively
10          and realistically eliminate it as a factor in this case.

11  RT 5377.

12          A motion for new trial was made, and extensively argued on this subject.  The

13  trial court, as respondent recounts, made a very lengthy, oral reasoned decision in denying the

14  motion.  RT 5498-5504.  The trial judge again recounted how he was impressed with the fact that

15  jurors knew not to discuss the information given by Juror 12, and the reasons why Juror 12's

16  information might be unreliable.  He discussed his lengthy and numerous admonitions to the

17  jurors.  The trial judge recounted examples of where other juries had abided by the instructions to

18  ignore damaging evidence.  The trial judge specifically discussed Juror 11:

19          Obviously juror number 11 is one where we have some issue of
            what his state of mind is and whether he can or did decide this case
20          without reference to this evidence.  I think he expressed, in looking
            at the totality of what he said, that he [unintelligible] thinking it
21          through believed he could do it.  He understood he should do it.

22          When pressed he did acknowledge that he could not assure us, he
            could not eliminate any possibility that that would influence him.
23          Many [sic] I just don't think that the possibility of a conscientious
            juror who is there telling you I felt I can deal with it, that's how I
24          arrived this morning, and dealt with it, and I was okay, but I can't
            guarantee you– I can't guarantee you that it would have no effect
25          on me, I just think that is not a situation in which I can say there is
            a substantial likelihood that that juror was influenced
26          [unintelligible] It just doesn't meet – sure, it's a possibility.  It's a

                                          26

1    possibility.  But I don't think it's a substantial likelihood.

2  RT 5500.

3  The trial judge also gave his reasons why he thought the evidence in the case overwhelmingly

4  pointed to all defendants' guilt.  RT 5501-5502.

5    The Court of Appeal found misconduct, not in the sense that Juror 12 had

6  innocently overheard Gains' statements, but in the sense that she should have reported the matter

7  earlier.  It then turned to the issue of prejudice.  Applying the standards set forth in In re

8  Carpenter, 9 Cal. 4th 634, 38 Cal. Rptr. 2d 665 (1995), the appellate court concluded that a

9  presumption of prejudice attached due to the report of the information to the other jurors.

10  However, the prejudice, juror bias, must have risen to a likelihood of substantiality before a

11  verdict would be overturned.  The bias could first warrant reversal if the information received

12  was "'inherently and substantially likely to have influenced the juror,'" or if the [a] juror was

13  actually biased.  Opinion at 60.  A juror was inherently likely to be biased when "'the extraneous

14  information was so prejudicial in context that its erroneous introduction in the trial itself would

15  have warranted reversal of the judgment,'" or actually biased when, under a totality of the

16  circumstances, there is a substantial likelihood of actual bias.  The Court of Appeal opined:

17    In this case, we think that presumption [of prejudice] was rebutted
     and that the remaining jurors were capable and willing to decide
18    the case solely on the evidence.  We recognize that in the abstract,
     the information had the potential to be highly prejudicial because,
19    as defendants argue, it completely contradicted their alibi defense.
     Nevertheless, we think under a totality of the circumstances in
20    which the statement was heard and disclosed to the jury, the
     prejudicial impact was sufficiently dissipated by several factors.
21    Those include the fact that the statement was made by a brief
     whisper overheard by only one juror who admitted she may not
22    have heard the statement clearly; by the jurors themselves who
     recognized the statement was unreliable hearsay and may have
23    been misunderstood, by the foreman who instructed the jurors not
     to consider it, and by the court when it admonished each juror
24    individually to disregard that statement, explaining at length why it
     was unreliable, pointing out that the information had not been
25    subject to cross-examination or explanation, and may well have
     been misheard or misunderstood by Juror Number 12.  The jurors'
26    angry response to Juror Number 12 and their brief and singular

27

discussion of the matter further attest to their ability to disregard the information.

Furthermore, the jury acquitted co-defendant Bolds of all charges although the information disclosed by Juror 12 clearly placed Bolds at the scene of the crime. While defendants attempt to minimize the significance of this fact, arguing that the evidence against Bolds was very limited and that Juror 12 was not sure she heard Gains say "Kenny," we think Bolds' complete acquittal on all charges strongly supports the conclusion the jury was able to disregard the information disclosed to them by Juror 12.

Moreover, we think there was overwhelming evidence of defendants' presence at the scene of the crime established by strong evidence of motive, and pre-crime and post-crime admissions and confessions of conduct, further rebuts any prejudice stemming from the information disclosed to the jury.

Opinion at 61-63

With respect to Juror 11, the appellate court found in footnote 20:

Defendants argue the response by Juror 11 to the question whether this information may have some influence on his further deliberations indicates that at least one juror was not able to disregard the statement. We disagree. In response to the question, this juror testified that he would like to think the information would not have some influence, he would try his best, but he could not assure the court that it would not. We think this statement is the statement of an honest juror who was not willing to guarantee absolute perfection. But, as the court in In re Carpenter... cautioned, perfection is not required.... "If the system is to function at all, we must tolerate a certain amount of imperfections short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic."...Juror Number 11 knew what was expected of him, understood that the information was hearsay and inherently unreliable, and as discussed above, was able to render a verdict acquitting co-defendant Bolds of all charges. We do not think that these circumstances establish a "substantial likelihood" that Juror 11 was biased.

This case is almost governed by the on-point discussion of Williams v. Woodford, 384 F.3d 567, 624-628 (9th Cir. 2004), concerning an acting-out defendant. In Williams, a capital case trial, the defendant had uttered a statement interpreted by a juror as a serious threat. The court interviewed that juror and the foreperson, but declined to interview the jury as a whole because the foreperson had testified that no discussion had taken place regarding the defendant's

28

1   conduct until after the verdict had been reached.  The Ninth Circuit found defendant's

2   misconduct not to be "extraneous evidence," and declared that the defendant could not profit

3   from his own misconduct.  That is, a defendant cannot bootstrap his own conduct into a

4   presumption of prejudice.  However, in every such case of defendant misconduct, the trial judge

5   was to "use reasonable means tailored to the particular circumstances of the case to help ensure a

6   fair trial."  Id. at 627.  Of particular interest here is that once Juror 12 imparted her information,

7   the jury determined not to discuss it.

8           If the petitioner here were Gains – Williams would be the end of the story.  Gains

9   only has himself to blame for his ill-advised comment on the evidence, and his statement is not

10  really extraneous evidence as to himself, nor would it be viewed as inadmissible hearsay, i.e.,

11  what is an admission if this is not it?  Gains was advised of his right to remain silent through

12  normal arraignment procedures, and if he did not remain silent – too bad, and he ran the risk that

13  his comments might be misunderstood, although that is highly unlikely given the unsophisticated

14  nature of the information he imparted.  But, the petitioner here is Cook – who played no part in

15  the giving of the information.  In some sense, there are procedural risks inherent to the state in

16  trying multiple defendants together.  One defendant can unduly prejudice a co-defendant.

17          Thus, the court concludes the parties are correct in treating this matter as one of

18  extraneous facts vis-a-vis Cook.  As to this petitioner, the facts are no different than if the juror

19  heard a friend of Gains out in the hall relating what Gains had said.  In this vein, the directives

20  set forth in Caliendo v. Warden of California Men's Colony, 365 F.3d 691 (9th Cir. 2004), are

21  the directives to be applied in this § 2254 AEDPA case *except as to its harmless error rule:*

22          We and other circuits have held that Mattox established a
        bright-line rule: Any unauthorized communication between a juror
23      and a witness or interested party is presumptively prejudicial, but
        the government may overcome the presumption by making a strong
24      contrary showing. [citations omitted]

25          The Mattox rule serves an important function in our system of
        justice. It protects and safeguards defendants' Sixth Amendment
26      rights to a fair trial and to confront and cross-examine witnesses.

29

See Rinker v. County of Napa, 724 F.2d 1352, 1354 (9th Cir.1983) (applying the Mattox rule to a civil action and stating that the "harm inherent in deliberate contact or communication can take the form of subtly creating juror empathy with the party and reflecting poorly on the jury system"); Agnew v. Leibach, 250 F.3d 1123, 1133 (7th Cir.2001) (because of an extrinsic contact, the jury "had the opportunity to develop confidence in [the witness's] word in ways that were not subject to cross-examination or the right of confrontation"); United States v. Harry Barfield Co., 359 F.2d 120, 124 (5th Cir.1966) ("Our system of trial by jury presupposes that the jurors are accorded a virtual vacuum wherein they are exposed only to those matters which the presiding judge deems proper for their consideration. This protection and safeguard must remain inviolate if trial by jury is to remain a viable aspect of our system of jurisprudence. Any conduct which gives rise to an appearance of evil must be scrupulously avoided.").

At the same time, the Supreme Court has recognized that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).  Indeed, "certain chance contacts between witnesses and jury members – while passing in the hall or crowded together in an elevator – may be inevitable." Gonzales v. Beto, 405 U.S. 1052, 1058, 1055, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972) (memorandum dissent and concurrence). Given this reality, if an unauthorized communication with a juror is de minimis, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution.  "A defendant must offer sufficient evidence to trigger the presumption of prejudice ..." United States v. Day, 830 F.2d 1099, 1103-04 (10th Cir.1987) (a juror and a federal agent who sat at the prosecutor's table exchanged a "casual, time-of-the-day greeting" in the men's room). See also Lee v. Marshall, 42 F.3d 1296 (9th Cir.1994) (two police officers, one of them the investigating officer in the case, entered the jury room during deliberations without the court's permission to set up a VCR to replay a witness's testimony); Johnson v. Wainwright, 778 F.2d 623 (11th Cir.1985) (sheriff had a dual role as bailiff and assistant to the prosecution); Helmick v. Cupp, 437 F.2d 321 (9th Cir.1971) (three arresting sheriff's deputies, one of them a prosecution witness, drove the jurors to the scene of the crime after being designated by the trial court as bailiffs for that purpose).

The Mattox rule applies when an unauthorized communication with a juror crosses a low threshold to create the potential for prejudice. A communication is possibly prejudicial, not de minimis, if it raises a risk of influencing the verdict. Prejudice is presumed under these circumstances, *and the defendant's motion for a new trial must be granted unless the prosecution shows that there is no reasonable possibility that the communication will*

> *influence the verdict.* See O'Brien, 972 F.2d at 14; United States v. Dutkel, 192 F.3d 893, 899 (9th Cir.1999). [FN3 omitted]

Caliendo, 365 F.3d at 696-697 (emphasis added).

The undersigned is confused by the Caliendo harmless error rule in this § 2254 context that, in order to overcome presumed prejudice, the *state* must demonstrate "that there is no reasonable possibility that the communication will influence [would have influenced] the verdict." The Ninth Circuit in Caliendo fashioned a harmless error rule for jury receipt of extrinsic evidence that is at odds with Ninth Circuit precedent in § 2254 cases, both before and after Caliendo, and much more stringent than the ordinary § 2254 rule.

> Thus, the only issue before us is whether the error was harmless; that is, whether the extrinsic information had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); cf. Bains v. Cambra, 204 F.3d 964, 977 (9th Cir.2000) (stating "we now join the vast majority of our sister circuits by deciding that the Brecht standard should apply uniformly in all federal habeas corpus cases under § 2254").

Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (juror misconduct issue). See also Fields v. Brown, 431 F.3d 1186, 1209 (9th Cir. 2005); Thompson v. Borg, 74 F.3d 1571, 1575 (9th Cir. 1996); Jeffries v. Wood, 114 F.3d 1484, 1489 (9th Cir. 1997 en banc). In the situation where a state court applied its own, appropriate harmless error rule (which would equal or exceed that of Brecht), in the AEDPA context, the court first determines whether the application of that rule was objectively reasonable, and if not, it would apply the Brecht analysis. Medina v. Hornung, 386 F.3d 872 (9th Cir.2004). See also Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir. 2005).[12] The issue of how to gauge prejudice for jury misconduct is important because if Caliendo applies, the state courts applied the wrong prejudice standard, and the ultimate conclusion as to juror misconduct would be entitled to no deference.

\\\\\

---

[12] Where the state court applied an erroneous harmless error standard, the federal court will immediately revert to the Brecht standard.

1    The Caliendo panel ignored binding precedent as it did not even discuss the cases

2    which had held that Brecht would ultimately apply to the prejudice analysis in jury misconduct

3    cases.  It was not free to do so.  In such a case, the undersigned must follow the earlier precedent

4    (and later, consistent precedent as well).  United States v. Rodriguez-Lara, 421 F.3d 932, 942

5    (9th Cir. 2005): "See Obrey v. Johnson, 400 F.3d 691, 699-701 (9th Cir. 2005) (recognizing and

6    resolving tension among Ninth Circuit cases applying conflicting versions of the harmless error

7    standard in civil cases); see also H & D Tire & Automotive-Hardware, Inc. v. Pitney Bowes, Inc.,

8    227 F.3d 326, 330 (5th Cir.2000) ('When panel opinions appear to conflict, we are bound to

9    follow the earlier opinion.')."  Therefore, the court will determine prejudice under

10   Medina/Brecht.

11   One could argue that the state court applied the wrong harmless error standard

12   because Caliendo applied a longstanding United States Supreme Court holding (Mattox), i.e., the

13   federal harmless error standard required in non-habeas cases.  However, that does not help

14   petitioner (or save Caliendo) because the analysis would then revert to Brecht, i.e., did the error

15   have a substantial and injurious effect on the verdict?  Assuming that the California court should

16   have initially determined harmless error under the rule of Mattox/Caliendo, the undersigned must

17   analyze the situation under Brecht.  Thus, the undersigned will advance straight away to the

18   Brecht harmless error standard.

19   The court pauses only a moment to determine the predicate fact to the

20   presumption of prejudice here.  No reasonable court could determine, nor did the California

21   Court of Appeal determine, that the presumption of prejudice was inapplicable here.  In the

22   abstract, and not considering the totality of the circumstances, Juror 12's information effectively

23   torpedoed the crux of the defense – defendants were not present at the scene of the crime.  It is of

24   no import that Gains did not mention Cook by name.  Petitioner Cook had testified that Gains

25   was with him at the time of the murder watching a movie; once the jury knew that Gains was at

26   the scene, it would necessarily know that petitioner herein, Cook, had lied in a very important

1    particular.  Most jurors, *if* considering and accepting the extraneous information, would then

2    disregard the entirety of petitioner's alibi testimony.  Surely, Juror 12's information about Gains'

3    "confession" was not de minimis.

4              For the reasons set forth by the California Court of Appeal, the undersigned finds,

5    however, that the prejudicial information did not have a substantial and injurious effect on the

6    verdict.  The undersigned really can't improve on the analysis of the appellate court, and thereby

7    adopts it as his own.  Emphasis is required on the fact that in most cases, the reviewing court is

8    left to infer that the information *could not have had* an effect on the verdict from what the jurors

9    told the judge, i.e., "We promise, judge, not to consider it."  We not only have such here, the jury

10   was very strong in its belief that the information should not and would not be considered (the

11   jurors had come to this conclusion even before the court admonished them), but we also have

12   *direct* evidence that the jury *did not consider it.*  One of the persons stated by Gains to be there,

13   Kenny Bolds, was acquitted.  It would fly in the face of reason for petitioner to suggest that even

14   though the jury "accepted" and considered Gains' statement, it nevertheless decided there was

15   insufficient evidence to convict Bolds.  Rather, the jury must have rejected the Gains'

16   information conveyed by Juror 12, and then acquitted Bolds because of insufficient evidence.

17   Petitioner cannot, and does not, deal with this very important fact.

18             Nevertheless, petitioner methodically goes through the factors set forth in Ninth

19   Circuit cases[13] concerning how to assess prejudice, and attempts to twist those factors in

20   petitioner's favor.  The worn aphorism of a square peg and round hole comes to mind for most of

21   the argument.  Factor 1 – whether the extrinsic material was actually received, and if so, how:

22   The jury did verbally receive the information, but received it in a hostile manner, and in the space

23   of seconds rejected its use.  Moreover, the jury was instructed to deliberate from scratch after

24   replacement of Juror 12, and without consideration of the Juror 12 information.  Therefore, in the

25

26   _____

     [13] <u>Bayramoglu v. Estelle</u>, 806 F.2d 880, 887 (9th Cir. 1986).

deliberations that counted, it was not received at all.  Factor 2 – the length of time it was

available to the jury: Except with respect to Juror 12, who was excused and is therefore

irrelevant, mere seconds elapsed before the jury determined on its own not to consider it.  Factor

3 – the extent to which the jury discussed and considered it: Not whatsoever.  Petitioner makes a

stab at suggesting that the trial court's admonition reinforced the information in the jurors'

minds.  However, not only was the trial judge under a mandatory duty to give such an

admonition, the judge's words merely reinforced the jurors in their own belief that consideration

of the information was wrong.  Indeed, the trial judge did not focus at all on the substance of the

information; he focused only on its unreliability.  A trial judge could not have acted more

correctly.  Factor 4 – whether the material was introduced before a verdict was reached, and if so,

at what point in the deliberations: The information was introduced at a point when most of the

discussion had been exhausted.  Indeed, one juror told the judge that he had already determined

the facts which would underlie his decision, RT 5326, 5328, again in the deliberations that

counted, the information was not received at all.  Factor 5 – any other matters:  this factor itself

has been broken into 5 subfactors: the ambiguity, or not, of the extraneous information; whether

the extraneous information was otherwise admissible or merely cumulative of other evidence;

whether a curative instruction was given; the trial context; and, given the totality of the evidence

and issues, whether the information was prejudicial.

Petitioner loses on these subfactors for every one except the first.  The

information was not ambiguous.  An argument cannot be candidly made that Juror 12 did not

hear what she thought she heard.  Gains saying that he was there, and in such and such a place, is

hardly ambiguous, nor subject to probable distortion.  Certainly, anything is possible, but

ambiguity is not probable.  Nevertheless, the information would have been admissible if procured

through a source other than the juror.  The information was an admission as to Gains, and would

not have violated the rule of Bruton because petitioner was not mentioned or directly implicated.

(Bolds may have had a Bruton issue).  The fact that Cook cannot realistically or truthfully say

34

1  Gains was with him when he then testifies in light of the admission does not make the evidence

2  inadmissible.  Certainly a curative instruction was given, and it was about as good as it could get.

3  The trial judge and the Court of Appeal both opined that the case was not close on its facts.

4  There was little prejudice in the total context of the evidence.

5     Thus, no matter what format or factors one uses to analyze the issue of prejudice,

6  one cannot find that petitioner's verdict was substantially and injuriously affected.  Petitioner's

7  jury misconduct claim should be denied.

8  *Conclusion*

9     For the above stated reasons, the petition for habeas corpus should be denied.

10     These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within ten days after service of the objections.  The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED: 8/18/06

19            /s/ Gregory G. Hollows
          UNITED STATES MAGISTRATE JUDGE

20
21  GGH:gh:035
cook2240.157

22

23

24

25

26