IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW LOREN COOK,

       Petitioner,             No. CIV S-02-2240 LKK GGH P

   vs.

ANTHONY LA MARQUE,

       Respondent.       FINDINGS AND RECOMMENDATIONS

_____/

*Introduction and Summary*

On August 18, 2006, the undersigned issued Findings and Recommendations which in part recommended that petitioner's <u>Batson</u> claim be denied. As a first basis for denying the claim, the undersigned had found that petitioner had not shown the state courts' decisions on pretext to be in error by "clear and convincing evidence" pursuant to 28 U.S.C. § 2254(e)(1).[1] The Honorable Lawrence K. Karlton remanded the <u>Batson</u> claim to the undersigned for further

---

[1] "Pretext," as all understand, is the third determination to be made in a <u>Batson</u> situation, the first two being respectively (1) whether a party asserting unlawful discrimination in juror selection has made out a prima facie case of unlawful discrimination in juror selection and (2) whether the party opposing the assertion of discrimination has articulated facial, non-discriminatory reasons for the striking of a juror(s). The third determination involves the trial court's decision as to whether the striking party's articulation of non-discriminatory reasons was but a pretext for striking the juror, the real reason being discrimination. <u>See</u> <u>Kesser v. Cambra</u>, 465 F.3d 351, 360 (9th Cir. 2006).

1

1   analysis because the Ninth Circuit in the interim between the Findings and his Order had found

2   *en banc* that the "unreasonable determination of facts" provision of 28 U.S.C. § 2254(d)(2)

3   governed the analysis of pretext in the absence of outside-the-state-record evidence presented to

4   the federal habeas court.  Kesser v. Cambra, 465 F.3d 351, 358 (n.1) (9th Cir. 2006) (en banc).

5   The undersigned asked for further briefing by the parties which was timely received.

6        As cases subsequent to Kesser have found, if a state court fails to apply federal

7   "comparative analysis" law in making its pretext factual determinations, no § 2254 (d)(2)

8   deference is due the state decisions.  Having reviewed the post-remand briefing and cases

9   decided subsequent to Kesser, the undersigned finds:

10       1.  De novo factual review of pretext on the state record is appropriate because in

11   determining pretext the state courts did not engage in a comparative analysis of stricken vs. non-

12   stricken jurors' attributes;

13       2.  The facts demonstrate some unlawful bias thought process on the part of the

14   prosecutor;

15       3.  However, the legitimate reasons expressed by the prosecutor cannot be

16   considered pretextual;

17       4.  Even assuming that the prosecutor was influenced in his strikes by

18   discriminatory animus to the point where otherwise legitimate reasons would be considered

19   pretextual *by this prosecutor*, the presence of legitimate reasons for striking the jurors as

20   expressed by the prosecutor, the "one good, one bad" theory, would objectively and inevitably

21   have resulted in the removal of the jurors.

22   *Facts*

23       The undersigned will borrow liberally from his recitation of the facts applicable to

24   each juror in the analysis section supplemented by further review as necessary.  The undersigned

25   repeats here the very general background facts and procedural facts applicable to the Batson issue

26   given in those Findings for context purposes.

Petitioner was convicted of, inter alia, murder and attempted murder.  The prosecution theory was that petitioner, and others, planned a retaliatory murder for the pistol whipping which one of the victims had imposed on petitioner.  The defense theory implicated a co-defendant who pled and testified for the government.  This co-defendant assertedly masterminded the murder and attempted murder as a result of a drug deal gone sour. Importantly, petitioner directly, and the co-defendants by inference, attempted to convince the jury that no defendant was present at the scene of the crime.

Petitioner is serving a life sentence and a consecutive 25 years to life sentence.

The precise reasoning given by the prosecutor for using peremptory strikes against African-American jurors is given exhaustively below, but the outline of the dispute copied from the opinion of the Third District Court of Appeal (Blease, J) is as follows (with bracketed material added)[2]:

> In the course of jury selection, the prosecutor used six of his 25 peremptory challenges to excuse prospective jurors who were African American.  Counsel for defendant Gains [a co-defendant] moved for mistrial under *Batson/Wheeler*.  The trial court found no pattern of discrimination, but agreed to reconsider the matter at a future time upon request.

[As everyone would agree, the trial judge used an improper standard for judging the prima facie case on this day.  The trial judge relied on the fact that because two African American jurors remained on the panel, and that this percentage was greater than the percentage of African American jurors in the community, no pattern of racial exclusion had been presented.  See RT 1440-1441.  However, this error is of no consequence, as the trial judge later reflected on his error, and ultimately found that a prima facie case of exclusion existed.]

> The following day, the prosecutor exercised a challenge against a seventh African American juror, after the defense had excluded the remaining two African American jurors whom the prosecutor had

---

[2]  The opinion was partially published on a state law issue not pertinent here.  See 91 Cal. App. 4th 910, 11 Cal. Rptr. 2d 204.

1    passed on.  Counsel for defendant Gains renewed his motion for
     mistrial under *Batson/Wheeler*, joined by the other defendants.
2    The trial court found the defense had established a prima facie case
     and required the People to give a statement of reasons for his
3    exercise of seven peremptory challenges.

4          The trial court did not analyze the challenged jurors one-by-one.  Rather, the trial

5    court gave a lengthy general analysis of the difficulty in making a factual pretextual

6    determination, but did conclude:

7          I find in each case that Mr. Steed has given an adequate basis for
           him doing so [exercising challenges].  I will, as I pointed out
8          earlier, in some of them having been challenged, he brought out a
           dozen things that were factors in each case, normally emphasizing
9          one or two that were the important ones, the triggering ones, and
           the others just along the way were factors one might consider.
10   RT 1853.

11                                        ***

12         So as I say, that may explain why seven out of nine were excused.
           As the point was made, even if nine are excused, if there are
13         legitimate neutral reasons to exclude that juror, then the system
           permits that, recognizing that otherwise, we would have two
14         different standards [for challenging majority and minority jurors].

15   RT 1856.[3]

16          As discussed at some length below, the Court of Appeal did analyze the jurors

17   one-by-one.  However, the analysis of the Court of Appeal appeared to stop at the point where

18   the facial validity of the prosecutor's reason(s) were determined (Step 2 of the Batson analysis).

19   For example, with respect to Juror Reynolds, the Court of Appeal determined that the

20   "prosecutor gave several reasons for excusing this juror."  Then it was determined that the

21   reasons given were race neutral.  "We find these reasons are reasonable, race-neutral reasons

22   related to this particular case."  And, to be sure, the reasons highlighted by the Court of Appeal

23   were on their face reasonable, and non-discriminatory.  The Court of Appeal concluded: "The

24   _____

25          [3] The Court of Appeal also quoted the trial judge as stating that the prosecutor's reasons
     "[were] not pretext."  Court of Appeal Opinion at 18.  No Rt designation was given for the quote
26   and the undersigned cannot locate it.  However, the undersigned will assume the appellate court
     was quoting the record.

                                           4

1   prosecution must give only one race-neutral explanation for each questioned challenge. [citation

2   omitted] Having given several race-neutral explanations, we find the trial court properly upheld

3   this challenge."  However, no analysis was made, either on a totality of the selection process, or

4   otherwise, concerning whether the otherwise valid reasons were but a pretext for discriminatory

5   juror challenges.  The remaining stricken jurors in issue were analyzed in the same fashion.

6        Neither the trial court nor the Court of Appeal engaged in any comparative

7   analysis of the attributes of stricken jurors versus non-stricken jurors with those same attributes.

8   The Court of Appeal, relying on state authority, expressly eschewed making such an analysis.

9   Opinion at 27-28.  Respondent asserts in supplemental briefing that the trial court, in essence,

10  must have conducted a comparative analysis because this analysis was presented by defense

11  counsel.  The record demonstrates no actual juror comparisons made by the trial judge.

12  Respondent argues, however, because the defense presented such an analysis to the judge, and

13  the judge related, inter alia, that he initially does not scrutinize the jury questionnaires as do the

14  lawyers, hence "there's a wealth of information here that I may have ignored," RT 1854, this

15  means that he must have scrutinized the defense information in a comparative sense, and

16  performed the required comparative analysis.  With respect, that argument has no factual basis

17  for it in the record.  There is no authority for an "implied comparative analysis" by the court.

18  The only reference to comparative analysis by the trial court was a general, philosophical

19  reference to such, and such obviously is not a comparative analysis itself.[4]

20  \\\\\

21  \\\\\

22

---

23        [4] "In so doing, one raises issues that one can point out, and say that's not too – that's not
    a very credible argument, because it was not utilized against others.  When we have so many
24  questions, and so much information about these jurors, one can find what might be called
    inconsistencies, that is, a juror where Mr. Steed thought question 72 was important, as to that
25  juror, but ended up accepting somebody else who similarly reacted to question 72.  Once again,
    one must look to at the total analysis that one has made."  RT 1854.
26  No actual comparison was ever made between jurors by the trial judge.

*Discussion*

    A.  <u>Does the Failure of the State Courts to Use Comparative Analysis of Stricken versus Non-Stricken Jurors Require De Novo Review Here?</u>

    As the California Supreme Court has held, <u>People v. Johnson</u>, 47 Cal. 3d 1194, 1220, 255 Cal. Rptr. 569, a comparative analysis of stricken versus unstricken jurors is rife with potential problems.  The undersigned identified some of those problems as well in the initial Findings and Recommendations at p. 7.  The most perplexing potential problems is that no trial judge realistically can be expected to remember the answers of all jurors during a lengthy jury selection process.  Unless counsel paint the comparative analysis, there really is no comparison picture available to the judge.  However, the United States Supreme Court has determined that the benefits outweigh the potential problems.  "More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve.  If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."  <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241, 125 S. Ct. 2317, 2325 (2005).

    In <u>Kesser v. Cambra</u>, 465 F.3d 351, 361 (9th Cir. 2006) (en banc), the Ninth Circuit found a comparative analysis to be *required* when such information was part of the record:  "Furthermore, in *Miller-El*, the Court made clear that the comparative analysis is required even when it was not requested or attempted in the state court."

    The undersigned finds fault with the analysis of the Court of Appeal (the last reasoned decision) in that no comparative analysis of jurors was utilized in its analysis.  As briefed above, comparative analysis is often the most useful form of pretext finding.  At the very least, the court should have analyzed the comparative feature of jurors if only to ultimately reject the comparison.  Relying on state law, the Court of Appeal completely discounted such an

\\\\\

approach.[5]  While "overeagerness to serve on a jury," for example, may well be a legitimate ground upon which to exercise a challenge, the real proof of whether such a legitimate articulation could be but a pretext for discrimination may well depend on the consistency of a challenge to other jurors who present that same attribute.  Moreover, the Court of Appeal never really hit the crux of the matter – was the prosecutor's assertion exaggerated or fair?  Did the prosecutor's voir dire questions on the issue fairly try to clear up ambiguities, or did the prosecutor seek to insert ambiguity into another unambiguous record?  Questions of this type were not resolved by the Court of Appeal.  Rather, the Court of Appeal in its analysis herein would just recount the prosecutor's articulations of reasons, and the analysis would end, for the most part, with whether the stated reasons were valid on their face.  This analysis is more akin to Step 2 in the Batson analysis where the articulation of non-discriminatory reasons is at issue.  "The Johnson Court further noted, citing our decision in Paulino, 371 F.3d at 1090, that it 'does not matter that the prosecutor might have had good reasons[; W]hat matters is the real reason [potential jurors] were stricken.' 125 S.Ct. at 2418."  Williams v. Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006).  "Accordingly, to rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges."  Id.[6]

    It is clear from the recitation of facts that neither the trial court not the Court of Appeal employed a comparative analysis.  The issue then becomes – what does this mean with respect to the AEDPA analysis?  The Supreme Court and the Ninth Circuit have held that the

---

[5]  As demonstrated above, the trial court did not engage in such an analysis either.

[6]  The undersigned finds some fault with the comparative analysis of petitioner as well. Petitioner essentially argues that if the prosecutor articulated a reason for challenging a juror of color, he must challenge all jurors who have a similar reason to be challenged.  However, the reasons for challenging, or not, are very multifaceted, and "detriments" in one area might well be ameliorated or exacerbated by attributes in other areas.  While the comparative analysis should not demand "cookie-cutter" uniformity before a prosecutor's stated reasons may be found pretextual, Miller-El, supra, neither should the opposite unreasonable tactic be relied upon, i.e., ignoring stark differences among the jurors aside from the one attribute being compared.

1  erroneous determination of federal law applied to a factual analysis precludes the usual AEDPA

2  deference.  See Panetti v. Quarterman 127 S. Ct. 2842, 2007 WL 1836653 at *16 (when a state

3  court's adjudication of a claim "is dependent on an antecedent unreasonable application of

4  federal law," a federal court must "resolve the claim without the deference AEDPA otherwise

5  requires"); Paulino v. Castro, 371 F.3d 1083, 1090 (9th Cir. 2004) ("Because the court of appeal

6  employed the incorrect legal standard in reviewing Paulino's claim, we examine his Batson claim

7  de novo.").

8           In light of binding precedent, a de novo review must be employed.[7]

9           B.  Use of the "One Good-One Bad" Methodology When Reviewing the Pretext Issue

10          Assuming for the moment that a prosecutor has demonstrated a bias in his juror

11  challenges, and that the legitimate reasons *stated by this prosecutor* were pretextual, is such

12  necessarily dispositive of the Batson issue, or can a non-discriminatory reason for not having a

13  certain person on the jury negate Batson violation.  The undersigned has previously found in a

14  death penalty case, Crittenden v.Calderon, CIV-S-97-0602 FCD GGH final Findings and

15  Recommendations, February 27, 2003 adopted by the Hon. Frank Damrell, February 23, 2005.

16  In this case, although the en banc court majority did not reach the issue, the undersigned also

17

18          [7] Petitioner goes on to fault the Court of Appeal for other misapplications of federal law,
    most notably, going no further than step two of Batson in its analysis.  As observed above, there
19  is much to be said for this argument.  Moreover, the undersigned also initially found:
            At one point, the Court of Appeal, in reviewing the challenge to Juror Watkins,
20          declared: "A peremptory challenge must be upheld unless it is based 'solely' upon
            group bias.  (Wheeler, supra, 22 Cal. 3d at pp. 278-281).  Thus, even assuming the
21          prosecutor took this juror's beliefs too far [turning a racially neutral answer into a
            racially motivated answer], the experience clearly left her with a negative view of
22          the criminal justice system which is a legitimate basis for exercising a peremptory
            challenge."  Opinion at 25 n.12.  The court can find no basis in the holdings of the
23          United States Supreme Court for the holding that discrimination must be the sole
            factor guiding the prosecutor's actions before a Batson challenge will be upheld.
24          And, based on the Supreme Court cases cited above, the undersigned finds this
            legal holding to be an unreasonable application of established Supreme Court
25          authority.
    If it were necessary to double or triple-up on the errors in application of federal law in order to
26  justify the de novo standard of review, the undersigned would make these determinations as well.

relied on the logic of the <u>Kesser v. Cambra</u> panel decision as a secondary reason for recommending a denial of the petition:

> The undersigned adopts the reasoning set forth in <u>Kesser v. Cambra</u>, 392 F. 3d 327 338 (9th Cir. 2003) rehearing en banc granted, 425 F.3d 1230 (9th Cir. 2005) which cited to the uniform rule in AEDPA cases to this effect across the circuits. Although <u>Kesser</u> cannot be cited as authority on the subject, given its en banc pending status, there is no rule which precludes the adoption of its reasoning and that of the cited cases. In those cases where the record clearly shows the existence of the valid challenges for cause, and the record indicates that such reasons were the ones heavily relied upon by the prosecution, the ability of a petitioner to posit proof of some discriminatory animus will be insufficient to require retrials.

> The basis for this alternative ground of ruling is clear from the record. Every juror challenged herein had significant downsides unrelated to race, as set forth in the written questionnaire, that *any* reasonable prosecutor would probably have used as a basis for challenge. In such a case, it does a disservice to the criminal justice system to demand a complete purity of heart of the prosecutor, when any deficiencies therein played a de minimis role in the challenge to the juror.

Findings and Recommendations at 22-23.

However, the issue of "one good-one bad" was not further developed in the initial Findings because the undersigned had primarily analyzed the <u>Batson</u> pretext issue initially with a requirement that petitioner demonstrate the bias of the prosecutor by clear and convincing evidence, and under that standard respondent prevailed.

After further thought, the undersigned maintains his position that the "one good-one bad" theory has a place in analyzing <u>Batson</u> issues. Again, as the <u>Kesser</u> panel pointed out, the uniform rule is to not upset jury verdicts over a prosecutor's faulty mindset if the juror would have been excused in any event. Further research has not indicated a federal deviation from that rule whether the case is an AEDPA habeas case or not. <u>See</u> *Batson Challenges*, 15 A.L.R. 6th 319 citing *inter alia* <u>Weaver v. Bowesrsox</u>, 241 F.3d 1024 (8th Cir. 2001); <u>Howard v. Senkowski</u>, 986 F.2d 24 (2nd Cir. 1993); <u>Jones v. Plaster</u>, 57 F.3d 417 (4th Cir. 1995); <u>United States v. Tokars</u>, 95 F.3d 1520 (11th Cir. 1996); <u>Gattis v. Snyder</u>, 278 F.3d 222 (3rd Cir. 2002).

1    The court first reviews the prosecutor's challenges to determine whether he

2   exercised any such challenges with a discriminatory motive; if the court finds that one or more

3   challenges were exercised on a biased basis, the proponent of the strike, here respondent, must

4   demonstrate by a preponderance of the evidence that the strike would have been exercised for

5   legitimate reasons in any event.  See United States v. Tokars, 95 F.3d at 1533-1534.

6    Much of the analysis for the initial pretext finding and the secondary finding of

7   inevitability of the challenge being made in any event may overlap.  That is, in assessing the

8   prosecutor's state of mind, it is only logical that one looks at all the reasons articulated by the

9   prosecutor and makes a finding whether the entirety of the reasoning suggests a pretextual basis.

10  In determining whether a legitimate basis for challenging the juror(s) would have been utilized in

11  any event, the particularly strong or weak or somewhere-in-between legitimate basis may (again)

12  be objectively weighed to determine whether it alone warranted a challenge.[8]

13    This is not to say that the  "dual motivation theory" or "one good-one bad" theory

14  simply repeats the pretext analysis assigning a different burden of proof.  Pretext focuses upon

15  the *subjective* intent of the prosecutor.  That is, even a facially legitimate reason for striking a

16  juror may be "pretextual" because the particular prosecutor is using this otherwise valid reason as

17  but a pretext to strike a juror on account of some unlawful reason.  The "one good-one bad"

18  theory, on the other hand, focuses upon the *objective* inevitability of the juror being challenged.

19  If the juror would have been challenged by the unbiased prosecutor in any event, it makes little

20  sense to cause a retrial of the case simply to make an abstract point.  Generally, in habeas corpus

21  actions there has to be some injury or detriment as a result of a constitutional error before that

22  error requires the great societal cost of a retrial.  See generally e.g., Brecht v. Abrahamson, 507

23

24    [8]  The undersigned deems respondent to have asserted a "one good-one bad" theory in this
case despite respondent's primary focus on finding the prosecutor's reasoning totally non-
pretextual.  In his supplemental briefing, respondent adopted the juror analysis of the

25  undersigned which included as an alternative, the dual motivation analysis.  Moreover, the
"burden" of respondent when the factual matter is of record is to simply argue the record facts

26  and the court makes the determination, i.e., the court in reality has the final burden.

1  U.S. 619, 637, 113 S. Ct. 1710 (1993) requiring a substantial and injurious effect on the verdict

2  before a habeas claim is granted.

3          Thus, it is possible to make a finding of pretext on the part of the prosecutor for

4  several challenges, but find ultimately that the objective prosecutor would have made the same

5  challenge.  As a result, there would be no <u>Batson</u> violation that requires a retrial.

6      C.  <u>Analysis</u>

7          The undersigned understands that in assessing whether the government's (or

8  defendant's) lawyer exercised strikes with an unlawful discriminatory motive, the entirety of the

9  pertinent aspects of jury selection should be explored.  <u>Kesser v. Cambra</u>, 465 F.3d at 359.

10 However, that analysis of the totality must be organized in some fashion, and it most logically,

11 initially centers about each juror whose challenge has been opposed.  Perhaps, then, there exist

12 some "macro" aspects of the selection  process which are worthy of comment.  As he did in the

13 initial Findings, the undersigned will analyze the issues in such manner.  The undersigned will

14 borrow liberally from the initial Findings, but because the matter is being reviewed de novo,

15 instead of with the requirement that petitioner show clear and convincing reasons why the factual

16 determinations of the state court were in error, that initial determination will be supplemented

17 and modified, if appropriate.

18      1.  *Pretext in a Batson Challenge*

19          A reviewing court does have tools to ferret out legitimate non-discriminatory

20 concerns and those reasons which constitute a pretext for discriminatory challenges.  Reasons

21 articulated by the prosecutor may be problematic on their face, e.g., challenging a person because

22 he lives in a "bad" area (known to be inhabited predominantly by a particular race or ethnicity).

23 Or in giving an explanation, a prosecutor may exaggerate the juror's statements, or may

24 incorrectly characterize them.  A court should examine the manner in which the prosecutor

25 questioned the members of a certain race as compared to another race, or whether an ambiguous

26 juror statement was never made the subject of attorney voir dire (assuming such was allowed).

11

Statistical disparities (or non-disparities) are important.  See Miller-El, 125 S. Ct. at 2337.  The

complete absence (or presence) of a reason for striking that would make sense to normal

prosecutors is important in the analysis.  Finally, "[m]ore powerful than these bare statistics,

however, are side-by-side comparisons of some black venire panelists who were struck and white

panelists allowed to serve.  If a prosecutor's proffered reason for striking a black panelist applies

just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending

to prove purposeful discrimination to be considered at *Batson's* third step."  Miller-El, 125 S. Ct.

2317, 2325.

How then do we judge the usual situation where the prosecutor gives a myriad of

reasons?  Kesser v. Cambra, supra gave the general outlines:

> The court must evaluate the record and consider each explanation
> within the context of the trial as a whole because " '[a]n invidious
> discriminatory purpose may often be inferred from the totality of
> the relevant facts.' " Hernandez, 500 U.S. at 363, 111 S.Ct. 1859
> (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040,
> 48 L.Ed.2d 597 (1976)); see also Miller-El, 125 S.Ct. at 2324
> (noting that Batson requires inquiry into " 'the totality of the
> relevant facts' about a prosecutor's conduct" (quoting Batson, 476
> U.S. at 94, 106 S.Ct. 1712)); Batson, 476 U.S. at 93, 106 S.Ct.
> 1712 ("In deciding if the defendant has carried his burden of
> persuasion, a court must undertake a sensitive inquiry into such
> circumstantial and direct evidence of intent as may be available."
> (internal quotation marks omitted)).  A court need not find all
> nonracial reasons pretextual in order to find racial discrimination.
> "[I]f a review of the record undermines the prosecutor's stated
> reasons, or many of the proffered reasons, the reasons may be
> deemed a pretext for racial discrimination." Lewis v. Lewis, 321
> F.3d 824, 830 (9th Cir.2003); see also United States v. Chinchilla,
> 874 F.2d 695, 699 (9th Cir.1989) ("Thus, the court is left with only
> two acceptable bases for the challenges.... Although these criteria
> would normally be adequately 'neutral' explanations taken at face
> value, the fact that two of the four proffered reasons do not hold up
> under judicial scrutiny militates against their sufficiency.")

Kesser, 465 F.3d at 359-360.

The court interprets Kesser as holding that where the invalid reason was a substantial factor in

the striking of a juror, the matter of pretext will generally be found against the prosecution,

especially in situations where the legitimate facial reason is subjective in nature.

1    Most of the analysis of pretext involves a look at the individual jurors; however,

2  cumulative tendencies that bespeak a certain state of mind are important as well.

3    2.  *The Prosecutor's Stated Reasoning; Petitioner's/Respondent's Observations;*

4  *the Undersigned's Resolution*

5    Juror Reynolds

6    The prosecutor excused this juror based on the juror's responses on a

7  questionnaire and his appearance in court.  However, the greater weight was placed on the

8  written responses because the prosecutor believed the written responses to be more candid.  The

9  prosecutor asserted that Reynolds was too eager to serve and improperly groomed (wearing a tee

10  shirt).  Reynolds was focused on the race issue as he had written that "black people have died for

11  this opportunity [to sit on a jury]."  Reynolds had made reference to the OJ case in that it

12  indicated to him that it pays to have wealth – indicating to the prosecutor that the juror would

13  have sympathy for defendants who did not have wealth.  The prosecutor thought that Reynolds

14  would not pay attention to circumstantial evidence as he had responded on the questionnaire that

15  he believed people were in jail based on circumstantial evidence.  The prosecutor asserted that

16  Reynolds had stated that he "would not follow the law."  Reynolds was challenged *primarily* on

17  the basis of his views on circumstantial evidence.  See RT 1741-1745.

18    Petitioner observes that the questionnaire specifically sought out responses to race

19  questions.  Mr. Reynolds was not overly focused on race as judged from the voir dire answers

20  when viewed in their entire context:

21  [Questioning by Defense Counsel Rocha]:

22    Q.  Mr. Reynolds, let's commence with you.  Do you not want to
     be here?
23    A.  Yes, I want to be here.
     Q.  And why is that?
24    A.  Well, first of all, I have never been a juror, and I think that
     being a black person, a lot of people have died for me to get this
25    right of all colors, not just black people, so I'm honored to be here.

26  RT 870.

1    Petitioner contests the prosecutor's rationale that Reynolds was "overeager" to

2 serve, comparing the non-stricken Juror 11 who desired to serve despite a personal hardship. The

3 "OJ Simpson" comment was discounted in that the questionnaire specifically asked for it, and the

4 prosecutor's inference drawing that the "wealth" comment would favor defendants was incorrect.

5 Petitioner lastly attacked the prosecutor's reliance on the "circumstantial evidence" comment

6 generally noting (without support) that many jurors had indicated a misunderstanding of the law,

7 and that such misunderstanding would be cleared up by instructions.

8    The undersigned agrees that the prosecutor's "focus on race" and "overeagerness"

9 could be viewed as a bit stretched when reviewing this matter with the aid of the actual words of

10 the transcript. As petitioner notes, citing <u>Batson</u>, the prosecutor cannot simply use the fact that

11 African Americans may be sensitive to race issues to justify a strike.

12    If "race sensitivity" had been the only or primary reason expressed by the

13 prosecutor, petitioner would be on the way to a winning <u>Batson</u> analysis.[9] But of singular

14 importance is that the prosecutor expressly, "*primarily*" relied on the circumstantial evidence

15 answer on the questionnaire. Reynolds had great doubt about the usefulness of circumstantial

16 evidence. In this respect, the prosecutor was spot on, and most tellingly, Reynolds expressly

17 indicated on his questionnaire, after being given therein the typical instruction on the valid use of

18 circumstantial evidence, *that he would not follow the rule of law that circumstantial evidence*

19 *could be relied upon*. Supp. Clerk's Transcript at 12. The red flag raised by this comment belied

20 any notion that this juror could be convinced to consider a body of evidence that is often

21 otherwise very persuasive. Whether or not this very opinionated statement could later be

22 overcome with more instruction, as petitioner speculates, the prosecutor had a very legitimate

23

24    [9] However, petitioner's comparisons with sitting jurors, <u>see</u> Amended Points and
Authorities at 17, miss the point. These comparative jurors were making academic statements
that racism still existed in this world. This is a much different issue and perspective from one
25 who believes himself to be a victim of racism. The sensitivity which concerned the prosecutor
arose from the victim's purported hypersensitivity to race issues *because* of the perceived victim
26 status.

concern at this juncture that this juror would impose a nothing-but-direct-evidence standard on the prosecution.  More importantly, if a juror had expressed that he would not follow the law in this one area, what other areas might the juror not follow the instructions because he disagreed with the law?[10]

If petitioner's case were based solely on this juror, the undersigned would find the absence of pretext in challenging this juror.  However, a final determination of pretext in this regard will await the assessment of the remaining jurors, as the totality of evidence could demonstrate, in whole or in part, some type of bias.

Juror Livingston-Blanks

The Court of Appeal at p. 20-21 of its opinion accurately characterized the reasons set forth by the prosecutor, and that summation is repeated here:

> The prosecutor gave numerous reasonable justifications for excusing Ms. Livingston-Blanks.  We therefore discuss only the main ones.  First, Mr. Steed stated that Ms. Livingston-Blanks' employment with Sacramento County in the Department of Human Services and Child Protective Services and some of her other answers indicated she might be one who has a liberal viewpoint and is more inclined to be sympathetic to the defense especially because of the young age of the defendants....
>
> Second, the prosecutor stated that the fact this juror's brother was a murder victim might affect her ability to be a juror in this case, especially because she hesitated in her response to the court when questioned on this issue....
>
> Third, the prosecutor stated his most important reason for excusing this potential juror was her statement she was the victim of spousal abuse and of "false arrest."  The prosecutor believed the juror's use of the term "false arrest" implied she had negative feelings toward law enforcement and the district attorney's office, and in fact, she cited the false arrest and spousal abuse as instances where she had a bad experience with law enforcement....
>
> Moreover, after looking into the matter of the alleged "false arrest," the prosecutor learned that Ms. Livingston-Blanks had misled the court because in fact she had been arrested for spousal

---

[10]  Moreover, the fact that this juror wore a tee shirt to court smacks of poor judgment on the part of the juror.

abuse and the matter was deferred upon entry of a guilty plea.  She also falsely characterized herself as the victim of these two crimes when she was the offender, not the victim.  The prosecutor felt these answers reflected negatively on her character and her integrity...

Petitioner tries hard to poke holes in the prosecutor's reasons, but ultimately the attempt fails.  First, petitioner demonstrates that the prosecutor did not strike Alternate 3 who was a licensed social worker, nurse and nun.  Also, the prosecutor did not strike Juror 6, whose brother-in-law had been murdered.  Petitioner then picks at the spousal abuse and false arrest reasons by attempting to justify the grammar used, and by asserting (without support) that Livingston-Blanks had actually been the victim of her drug-using ex boyfriend.  Finally, petitioner believes that the prosecutor's above and beyond investigation of this juror (as well as one other black juror) outside the confines of examination, demonstrated his intent to make a case to excuse black jurors whenever he could.

One could question the strength of petitioner's criticisms.  Petitioner points to one attribute of comparison without reflecting on the whole of the jurors compared.  That is, none of the compared jurors had misrepresented facts to the court.  Moreover, Alternate 3, who would probably never get to rule on the case, was not really similarly situated to a juror who, if not struck, would certainly rule on the case.  Also, finding one inconsistent application of the prosecutor's stated reasoning is not that persuasive.  But most importantly, this juror is similar to the previous one in that no matter how one would ultimately assess the criticisms, the fact that the prosecutor could reasonably believe from the facts given that this juror had misled the court is such a strong, valid reason that it outweighs by far all of the criticisms.  No reasonable prosecutor would fail to strike a juror who arguably misled the court as to the facts of her personal criminal experience.  This juror was likely prejudiced against the prosecutor's side of the law enforcement equation.

\\\\\

\\\\\

Juror Singleton

Mr. Singleton first came to the attention of the prosecutor for a possible strike because of his age (69) – the prosecutor wanted an age balance, but the prosecutor immediately discounted such as a reason for exercising the strike.  RT 1749.  The first real concern was that the juror stated he had three adult children but did not know of their present whereabouts.

This indicated to the prosecutor: "That is a concern to us in terms of his stability, his social make-up within a community, and how he might interact with the other jurors.  Being a parent myself, I find this very – this is very troubling to me, that a person would define them in a position where he either didn't care about his children, I think one could draw that inference.  It concerns me a great deal."  RT 1749.

Next, the prosecutor believed his questionnaire indicated that law enforcement testimony was "self-serving," [Actually, the questionnaire stated "some times they can be self-serving."]   "That's an immediate problem for me."  RT 1750.

Third, the prosecutor believed that some of Singleton's responses suggested that because Singleton had experienced prejudice, he believed himself to be a race victim, and, according to the prosecutor  "[t]hat is racist."  RT 1795.[11]  The "most troubling" aspect to the prosecutor was Singleton's court martial for domestic problems.

The next "most troubling" [the prosecutor used this phrase twice] Singleton attribute was his response to question 48 having to do with bad experiences with law enforcement: "I was arrested once for something only because I was with a woman of another race."  The prosecutor stated:

> He perceives himself further, this race issue goes further.  He sees himself as a victim of police misconduct in that he stated he was arrested once for something only because "I was with a woman of another race."  That's a very troubling response.  I'm not saying it

---

[11]  The questionnaire posed the question – "Would you say that you were raised in an atmosphere free of prejudice?"  Singleton answered "No," and explained: "I am a black man in America."

didn't occur.  I'm stating for a man from Alabama, that's where he is from, to make that statement, I think places the Government in this case, who has to produce law enforcement officers, and seeks credibility, that places me in a situation where he may be inclined to be sympathetic and leaning toward the defense in this case in light of the race of the two defendants.

....and it seemed to me he was very emotional when he responded in court.  When you asked him about that, he was emphatic about that, certainly he was troubled by that...

RT 1751-52.

Importantly, in the next question (Do you think this experience might cause you to be unfair to either side in *this* case?), Singleton answered, "<u>Yes</u>."  Although Singleton later sought to move away from this response in voir dire, the prosecutor believed the questionnaire response was the more forthright.  RT 1753.

Petitioner contests this strike on the primary basis that the prosecutor, not Singleton, was preoccupied with race issues.  Petitioner points out that the answer that a black person growing up in the south during the 30s and 40s believed himself to be a victim of discrimination (an indisputable fact) is hardly grounds to say that Singleton was preoccupied with race.  Moreover, believing that he was arrested on racial grounds, and that he remembers the unfairness of the arrest, again, is hardly grounds for believing that Singleton was so preoccupied with race that he would be anti-law enforcement.  Petitioner also faults the prosecutor's determination to strike Singleton because of his age pointing out that there was no age imbalance on the jury, and if anything, Singleton would have balanced the panel further.[12]  Also disapproved by petitioner was the prosecutor's reliance on Singleton's lack of contact with and knowledge of his grown children as other jurors were not questioned about their relationships with their children.

If the analysis were directed only towards Singleton, petitioner cannot win the Singleton battle.  While it is true that, when viewing Singleton's statement about his being a

---

[12]  However, the prosecutor said age was not a deciding factor.  RT 1749.

victim of discrimination in the abstract, the prosecutor may have had too much race on *his* mind, the response cannot be viewed in isolation from Singleton's other comments.  Having written in his questionnaire that he thought the racial arrest would cause him to be unfair, Singleton effectively precluded himself from serving on the jury.  The prosecutor could well have been correct, given the *entirety* of Singleton's responses, that for good reason or otherwise, Singleton remained too sensitive to his bad experiences to serve on the jury.  No prosecutor would be compelled to accept at face value any verbal retractions which may well have been an attempt to cover-up what may have appeared to be an embarrassing statement.

Again, however, the matter of pretext is determined on the totality of the circumstances, and the continued worry of the prosecutor that African-Americans are too sensitive to race issue to determine the facts fairly is beginning to weigh in petitioner's favor in terms of demonstrating a racial aspect to the prosecutor's challenges.

Juror Tillman

In a lengthy explanation about Juror Tillman (perhaps too lengthy), the prosecutor first mentioned that he thought this juror may have been related to the Tillmans who ran a bail and investigation agency.  Although the record is not clear on the point, the court understands that such was not the case, and through his investigation, the prosecutor understood this as well.

The prosecutor found fault with Tillman because he opined in the questionnaire that law enforcement is not always truthful.  Tillman also related that his brother had shot someone in self-defense, and the prosecutor termed this a "serious problem" for him, perhaps on account of the facts of the case he was about to try.  The prosecutor was concerned that Tillman had not reported his own arrest for DUI on the questionnaire, and that he had not reported that his girlfriend had recently assaulted him, for which a police report had been created (response to question about whether he had been a victim of a crime).  The prosecutor went on to say that Tillman's response to a question about witness believability – people will tell the truth simply because they take an oath – indicated to the prosecutor an inability to discern lying under oath.

1   The prosecutor (somewhat incredulously) believed Tillman would be an inflexible juror simply

2   because he reported in his questionnaire that he would change his position if he could see the

3   other juror's views.  The prosecutor also thought Tillman to be inflexible because in answer to a

4   question about why Tillman could be a fair and impartial juror he reported he could look at a

5   "picture" and make up his own mind about what the "picture" represented.  The prosecutor was

6   finally concerned that Tillman's aunt had been arrested for drug use (crank).

7   　　　　Petitioner does not mention the fact that Tillman had not reported his own arrest

8   and the fact that he had been a victim of an assault crime, but assails the prosecutor's reasoning

9   on the issue of "inflexibility" and judging a witness' credibility.

10   　　　　The prosecutor would have been well served to stop his explanation after voicing

11   the legitimate concerns that the juror had apparently not been truthful about his arrest record or

12   his crime victim status.  Jurors who are not honest in some particulars may well be hiding other

13   facts pertinent to the voir dire process, e.g., grudge against the criminal justice system and the

14   like.  However, the prosecutor rambled on, and in the process seemed to be "protesting too

15   much" about his reasons for striking the juror.  Saying that one might change his mind after

16   taking a hard look at the views of others is the antithesis of inflexibility.  Moreover, saying that

17   law enforcement may not tell the truth all the time hardly bespeaks a mistrust of law

18   enforcement.[13]  A statement that law enforcement is *always* truthful is absurd.  Case books are

19   full of situations where law enforcement personnel were not truthful.  Rather, the statement can

20   only be construed as a statement on the part of Tillman that he would scrutinize all testimony.

21   The prosecutor's statement that he thought witnesses would be deterred from lying because they

22   might fear perjury repercussions is rather a stretched reason for striking a juror – we all hope, at

23   least, that perjury laws have some deterrent effect.  Finally, as petitioner points out, many other

24   　　　　　　　　　　　　　　

25   　　　[13]   In addition, the questionnaire asked whether the juror would think that police
testimony was necessarily more truthful than a civilian's testimony.  Tillman said no and

26   explained, "They [police officers] are still human."  Saying that this response shows a mistrust of
law enforcement is "making stuff up."

1   jurors had criminal justice problems such that the aunt's arrest for drug usage is hardly unique.

2   The prosecutor did not endeavor to ascertain whether this experience had any real meaning to

3   Tillman such that he could not be a fair juror.  Finally, the prosecutor's reference to Tillman's

4   brother having shot someone in self-defense applied to juror Watkins.  It is unclear from the

5   record whether this confusion was ever corrected in the prosecutor's mind when discussing the

6   Tillman strikes, see RT 1755.

7           The undersigned previously found:

8               Exaggerating or "making stuff up" can show a discriminatory
                animus on the part of a prosecutor.  The court balances the
9               prosecutor's latter comments with Tillman's arrest record and
                victim omissions.  The prosecutor's stated primary reasons for
10              striking Tillman were legitimate, and the undersigned finds that the
                prosecutor held these beliefs not out of pretext but because they
11              were in fact his beliefs.  See RT 1758.  On balance, although it is
                close, the court finds insufficient "clear and convincing" grounds
12              to believe that the striking of Tillman was substantially based on
                race.

13

14          However, in this Findings and Recommendations, the court will withhold final

15   assessment on pretext as there remain a few jurors to analyze, and the review here is *de novo*.

16           Juror Watkins

17          Ms. Watkins, like Juror Tillman above, was challenged for reasons which

18   unequivocally would be justified, but also for reasons which were insubstantial.

19          The prosecutor challenged juror Watkins because her brother had been involved in

20   a shooting in which he asserted self-defense.  Evidently this defense was unsuccessful, and

21   Watkins' brother was sentenced to prison.

22              That he was prosecuted and he went to prison for 7 years, she
                believes it was self-defense, the inference being he was wrongly
23              convicted, thus, not only has law enforcement wrongly arrested her
                brother, but the fact her brother had to do seven years in prison for
24              a crime she feels he was not responsible for, that in and of itself
                excludes her, from our point of view.
25   RT 1759.

26   The prosecutor then went on to surmise that perhaps this experience made her feel that African-

                                            21

1   Americans were not treated fairly, or that an "inward" bias had resulted.  However, the

2   prosecutor went on to say that "the whole scenario" excludes her, from our point of view.  Id.  In

3   connection with this reason (and not in a vacuum as petitioner argues) the prosecutor quoted her

4   questionnaire response that Watkins indicated that she had problems with the criminal justice

5   system, but she was "not sure" what they were.

6          The prosecutor also stated that the witness had indicated bias in her judgment of

7   law enforcement testimony from her response that both law enforcement and civilians were not

8   always truthful.  Her work as an accounting clerk with a law firm bothered the prosecutor (this

9   last reason was said to be non-controlling).  That one or more of Watkins' friends smoked

10  marijuana added to the prosecutor's list (although there might not be many jurors in California

11  who could serve if having an acquaintance who smoked marijuana would disqualify one from

12  jury service).  The prosecutor finished up with Watkins' statements indicating that a long trial

13  would put work pressures on her, and she indicated that she did not want to serve for a long trial.

14         The court will not list all the factors of petitioner's precise argument, as they are

15  obvious.  Clearly, the prosecutor's assertion that because Watkins thought both law enforcement

16  and non-law enforcement could be untruthful, she therefore disfavored law enforcement

17  testimony is a non-sequitur and strained.  Being an accounting clerk in a law firm is insignificant

18  from the point of view of possible bias against the prosecution's case.  The fact that she knows

19  marijuana smokers does not say much, if anything, tangible about this juror.  Finally, the juror's

20  stated reluctance to sit for a long trial is insignificant.  Any working juror would have to feel torn

21  about the duties owed to one's employer or profession and the duty to sit as a juror.  Petitioner

22  cites to other jurors not struck by the prosecution who had this ordinary conflict.[14]

23
_____

24         [14]  Also, the prosecution is somewhat inconsistent in this reasoning.  If the juror does not
    seem to mind the time imposition, that juror is "overeager."  See Reynolds, above.  If the juror
25  does have problems with the time-to-serve factor, she won't pay sufficient attention during the
    trial being preoccupied with the personal concerns.  The prosecution can't turn every factor into
26  one that always points to a reason for challenging no matter what the response.  This is not to say
    that a juror who voiced a grave concern about the hardships entailed in being a juror would not

1    Also problematic is the prosecutor's inferential presumption that because Watkins

2 thought her brother wrongly convicted, it might mean that she would be race conscious in her

3 deliberation if chosen to be a juror.  As petitioner asks, why would a perceived wrongful

4 conviction necessarily, or even probably, involve racial issues.  Who had race on the mind,

5 Watkins or the prosecutor?  The evidence grows that this prosecutor exercised challenges in part

6 with a discriminatory mindset.

7    Juror Parker

8    The prosecutor's main reasoning to strike this juror involved her not being

9 employed outside the home, her stated unwillingness to determine one's state of mind from

10 circumstantial evidence, and the fact that she disapproved of accomplice testimony (initially

11 noting that the questionnaire response was left blank, and then indicating to defense counsel that

12 she disapproved of the practice).

13    The prosecutor stated other reasons for not liking this juror (none of which

14 expressly had to do with racial notions) with which petitioner takes issue.  However, because the

15 record does indicate that the prosecutor was actually concerned with the above non-racial factors,

16 the fact that he might be arguably "wrong" with his concept that homemakers do not have

17 sufficient social interaction to be good jurors, or that some other retained jurors had trouble with

18 the concept of understanding accomplice testimony, does not in itself prove a racial

19 predisposition on the part of the prosecutor.

20    Juror Maxey

21    The prosecutor utilized his challenge against this juror on account of her hardship

22 request (this juror actually made a hardship request to the court which was denied); her

23 "addiction" to the O.J. Simpson trial in which she learned that not all law enforcement was

24 _____

25 be subject to peremptory challenge, see Juror Maxey below; however, the rather ordinary
statement that a long trial will cause problems would seemingly not be a valid basis for
26 challenge.

1  honest, and her exposure to an alleged excessive force by police incident.

2          This juror actually thought enough about her hardship to make an actual request to

3  the court.  Unlike the Watkins' situation in which common, generalized notions of hardship were

4  noted, a good attorney will take notice of jurors who have gone so far as to request to the court

5  that they be excused.  Juror Maxey had just started a new job and was concerned that a long

6  absence would be inimical to her employment interests.  Such a juror may be unduly impatient

7  with the sometimes tedious court process, and might be quick to form concrete opinions in order

8  to short circuit the deliberative process.  Her fascination with Court TV, and especially the O.J.

9  trial, would place a prosecutor on notice that a juror may have become wedded with pre-trial

10  notions of law enforcement miscues and the like.  Finally, a prosecutor could be concerned with

11  an anti-law enforcement bias borne from this juror's perceived exposure to an excessive force

12  incident.

13          Macro Aspects

14          The undersigned has noted the overall statistics involved in the striking of

15  African-American jurors.  Seven strikes of black jurors would and should certainly get a judge's

16  attention, and is certainly a factor which may impose an adverse gloss on a prosecutor's

17  explanations.  The court also notes that the prosecutor did not challenge, and would have

18  accepted, two black jurors (which ironically the defense struck).  The Ninth Circuit has viewed

19  such a positive point for the prosecution.  "Although discriminatory intent may be inferred from

20  the fact that the prosecutor exercised four of his first twelve peremptory challenges to strike

21  jurors with Hispanic surnames, see Hernandez, 500 U.S. at 363, 111 S. Ct. 1859, at least one

22  Hispanic-surnamed member of the venire was empaneled.  This might indicate that the

23  prosecutor's motive was non-discriminatory.  See Turner v. Marshall, 121 F.3d 1248, 1254 (9th

24  Cir.1997)."  Sims v. Brown,  425 F.3d 560, 575 (9th Cir. 2005).

25          Note must also be taken that the prosecutor accepted one of the jurors even though

26  this black juror made comments which facially may have permitted a strike, and which in fact,

1   the prosecutor did assert was a reason to strike some of the jurors above.  In this case the

2   prosecutor went further than just explaining why he struck certain jurors.  He explained to the

3   court why he accepted the black jurors he did accept.  Especially noteworthy in this regard is the

4   prosecutor's explanation with respect to Juror Green.  This juror, like a few others, indicated that

5   she had been the victim of prejudice because she was African-American.  RT 1768.  Although

6   concerned about this response on account of the potential for using such a feeling to "rectify" that

7   injustice through an anti-prosecution verdict, the prosecutor believed that her other attributes

8   (including her profession, raising a family, having served on a criminal jury before which reached

9   a verdict) made this juror a leader, and one who could and would sort through the evidence in an

10  appropriate manner.  If the prosecutor were simply looking for an excuse to strike black persons,

11  he could have done so, with this juror, and would have thought that he had a facially plausible

12  reason for so doing.  He did not, and his action is not compatible with the argument that the

13  prosecutor had the mindset of using strikes simply to get rid of black jurors should be weighed.

14                   3.  *Determination of the Pretext Issue*

15                   Weighing all the evidence de novo, the undersigned finds that the prosecutor's

16  concern that African Americans would act adversely to the prosecution because of racial

17  sensitivity is a form of group subconscious bias actionable under Batson.  That is, the

18  prosecutor's state of mind that African American jurors are more likely to be anti-prosecution

19  because of historical discrimination is a group bias not to be permitted in jury selection.  See

20  Kesser, supra at 362 (prosecutor's belief that Native Americans associated with a tribe more

21  likely to apply "their" laws as opposed to "our laws" indicative of an invalid group bias).  The

22  undersigned finds that this sub-conscious bias existed throughout the jury selection.  Obviously,

23  as recounted in exhaustive detail, there is evidence that the undersigned should have come to the

24  opposite conclusion, especially the fact that the prosecutor did not strike two African-Americans

25  and his reasons for not striking them.  However, the number of African-American stricken, and

26  the prosecutor's repeated assertions in one form or another that the jurors were too racially

sensitive, and the completely bogus reasons expressed about some jurors outweigh the evidence to the contrary favoring the prosecution.  The undersigned found himself saying too many times that the prosecutor himself seemed overly race conscious to find to the contrary.  Additionally, the court is particularly impressed with the insubstantiality of many of the reasons put forth by the prosecutor in his reasoning with respect to jurors Tillman and Watkins.

A latent bias, if found, exists throughout the jury selection and does not disappear and re-appear willy nilly.  Further, it does not matter whether the prosecutor specifically challenged every juror with being too race conscious.  The deficient mind set expressed as to some jurors eventually becomes the mind set, express or implied, as to all.  In other words, a latent bias does not turn on and turn off.  Whether it is operative to any significant degree for a particular juror is another question.

This is not to say that the prosecutor harbored a conscious animus against African Americans; there is no such evidence of record, and the undersigned so finds.  Nevertheless, sub-conscious bias is precluded as well as overt bias.[15]  In this case, it might well be described as an undercurrent of unwarranted racial sensitivity to the criminal justice system bias.

Also, the undersigned is not finding that any layer of sub-conscious bias was a significant reason per se for challenging all or any jurors.  Obviously, for legitimate reasons, a juror can be "so bad" for the prosecution's case, that any hidden bias simply does not come into play.  Whether this fact should be analyzed under pretext or under a one good-one bad "defense" is up for debate because, as previously indicated, these fields of inquiry overlap.  But the court must find in any event the prosecutor's "real reasons" for challenging jurors as pretextual before moving on to any "defense."  If any bias is found to be very insignificant in respect to a particular juror, it cannot be said that the prosecutor's reasons were pretextual regardless of whether some form of bias was otherwise latently existing.

---

[15]  The undersigned does not find that the prosecutor was biased in all aspects of life, e.g., employment decisions.

1    Therefore, for the reasons previously set forth in each juror's section, the court

2   finds the prosecutor's challenges to jurors Reynolds, Livingston-Banks, Singleton and Maxey to

3   be non-pretextual.  The valid reasons for challenging these jurors were simply so weighty in

4   comparison to any found sub-conscious bias that the court finds such bias to be de minimis for

5   these challenges, i.e., the real reasons asserted by the prosecutor were not pretextual.

6    Juror Reynolds had stated that he would not follow the law on use of

7   circumstantial evidence.  As referenced previously, the prosecutor focused in on this problem,

8   and his unwillingness to accept any retractions of this strongly held view was not pretextual.  Ms.

9   Livingston-Banks had a warped view of the facts regarding her own arrest for spousal abuse

10  which she considered to be a false arrest and herself a victim.  Next, the court finds that the

11  prosecutor here challenged juror Singleton primarily on the basis that the juror had stated his

12  experiences might cause him to be unfair.  Reliance on this negative statement by the juror was

13  not pretextual, i.e., the undercurrent did not affect the real reason for this juror's challenge.  Juror

14  Maxey did give reasons for an actual hardship, which combined with her fascination for Court

15  TV and the OJ case were the real reasons for her challenge, even if colored somewhat by a racial

16  sensitivity bias.

17   That leaves jurors Tillman, Watkins and Parker to be assessed.  The effect of the

18  found bias is more difficult to ascertain for these jurors in that some of the prosecutor's reasoning

19  was especially bogus as to these jurors as to make one take even a closer look to determine

20  whether the undercurrent of bias affected this prosecutor's statement of legitimate reasons.

21   Juror Parker drops out of the analysis here.  As recounted above, the prosecutor

22  did not like the fact that this juror was a stay-at-home person not exposed to the "real world," and

23  hence would not be a sophisticated juror.  Given the fact that the undersigned has found a latent

24  bias on the part of the prosecutor, this dubious sociological assertion might be found pretextual.

25  But this stay-at-home reason was combined with two other strong reasons – the witness' dislike

26  of circumstantial evidence and her dislike of accomplice testimony (one that is shared, by the

1  way, in the jury instructions of many jurisdictions).  The prosecutor's case, nevertheless, may

2  well have relied on circumstantial evidence and possibly on accomplice statements.  While not as

3  overwhelming as the legitimate reasons given to drop out jurors Reynolds et al, the court finds

4  these valid reasons not to be pretextual.  The valid reasons, and not any undercurrent of bias,

5  directed the prosecutor's motivation for striking this juror.  Moreover, at this juncture, petitioner

6  retains the burden to show prosecutorial pretext for striking this juror.  The record does not

7  support the assertion that pretextual reasons were a substantial factor in the prosecutor's strike

8  motivation by a preponderance of the record evidence.

9          The undersigned believed the closest cases to be that of jurors Tillman and

10 Watkins.  As recounted above, the prosecution's thought process about Tillman's views on law

11 enforcement veracity and "inflexibility" were so strained as to be devoid of logic.  It can only be

12 inferred that the aforementioned latent bias (too racially sensitive), although not directly

13 expressed for Tillman, was at work with this juror, i.e., why else would the prosecutor assert

14 these bogus reasons.  Therefore, the legitimate reasons for striking this juror must have been so

15 weighty that one cannot ultimately find that the undercurrent of bias was actually a substantial

16 factor in this prosecutor's decision to strike on account of juror misrepresentation.  As previously

17 detailed, the factual analysis here dovetails with that of the "one good-one bad" theory below,

18 although it is again emphasized that the burdens are different.  However, for the reasons

19 expressed in the next section, the undersigned does not find that the decision to strike was

20 pretextual, but even if incorrect in this finding, certainly an objective view of the record would

21 have inevitably led to a striking of this juror.

22         With respect to juror Watkins, the prosecutor took the facially valid reason (this

23 juror thought that her brother had been "wrongly convicted" and hence might be biased against

24 the criminal justice system) and twisted this reason into a racial one – that this juror would

25 believe as a result that *African Americans* were not treated fairly in the criminal process.  Why

26 refer to race at all?  Any juror of any race whose close relative was wrongly convicted, or as the

juror sincerely believed, might think that the criminal system was unfair.  The reduction of a

reasonable, but negative, inference common to all races to that of an inference only to a specific

race is highly suspect.  Furthermore, other reasons given for striking this juror, that this juror

believed all civilians and all law enforcement were not always truthful (and she worked as an

accounting clerk in a law firm) were problematic to say the least in respect to their legitimacy for

exercising a strike.  Again, however, the strength of the primary reason given for striking negates

a finding that the found racial undercurrent caused this prosecutor to make up a legitimate reason

which he did not really, *primarily* believe warranted a strike.  This assessment is also detailed

below.

In sum, if this prosecutor had proffered relatively weak or subjective, facially non-

discriminatory primary reasons for striking the jurors, pretext would have been found.  However,

the primary reasons for striking the jurors were not subjective, and in the opinion of the

undersigned, were strong enough to blot out the effect of any discriminatory mindset on the part

of the prosecutor.

4. *Determination of Tillman/Watkins Pretext and the One Good-One Bad Defense*

The undersigned finds that the pretextual reasons given for striking juror Tillman

were not a substantial factor in this prosecutor's strike assessment, the undersigned finds in the

alternative, and with cognizance of a shifting burden, that the facially legitimate reasons given

would have led to an inevitable strike by a reasonable, i.e., non-biased, prosecutor.

The particular questions on the jury questionnaire at issue were as follows:

"43.  Have you or anyone close to you ever been the *victim* of a crime."  Petitioner answered

"yes," and "grandmother was mugged."  "44. Have you, any family member or any close friend

ever been *arrested* or *charged* of a crime, including misdemeanors such as driving under the

influence or petty theft."  Petitioner answered "yes," and "Brother-DUI."  (CR 754-755 emphasis

in original).   The Court of Appeal reported, and the court is unaware of any dispute with respect

to these facts, that juror Tillman, himself, had been convicted of DUI and had been initially

1  accused with, and later determined to be a victim, of a domestic assault crime.  The prosecutor

2  acquired knowledge of these facts during the jury selection process.

3         The more important of the discrepancies was the DUI conviction, but they both

4  count.  When a petitioner claims juror bias because of problems with questionnaires or voir dire

5  responses, the Ninth Circuit takes a dim view of misrepresentations by the juror; it is a big deal.

6  Green v. White, 232 F.3d 671 (9th Cir. 2000) misrepresentations about criminal history); Dyer v.

7  Calderon, 151 F.3d 970 (9th Cir. 1998) (en banc) (misrepresentation about being a victim of a

8  crime).  There is little reason to believe that it is not also a big deal for the prosecutor, when he

9  discovers the misrepresentation during voir dire.  A reasonable prosecutor would normally

10 challenge such a juror because the truth of all responses given by the juror is then in doubt – the

11 prosecutor would not know what to believe.  For this reason, the court finds (1) the absence of

12 pretext by this prosecutor in exercising a strike primarily on this ground, and (2) by a

13 preponderance of the record evidence that Mr. Tillman would have been challenged regardless of

14 any found pretext on the part of the prosecutor.  The challenge was inevitable.

15        With respect to Ms. Watkins, the undersigned also finds that pretext has not been

16 demonstrated here.  If incorrect in this finding, the issue becomes whether by a preponderance of

17 he evidence the objective prosecutor, i.e., a prosecutor not laboring under a notion that only

18 African-Americans would resent the justice system for the conviction of an assertedly innocent

19 relative, would have challenged Ms. Watkins for the fact that she did in fact have a resentment

20 which could affect the prosecution, as did the prosecutor in this case.[16]

21        In her questionnaire, Ms. Watkins reported in connection with whether she had

22 formed an opinion about the criminal justice system: "I have formed no opinions, *but I am not a*

23 *criminal*."  CR 1153 (emphasis added).  One could validly wonder why she volunteered the latter

24

25        [16]  Of course, the undersigned cannot make up reasons for challenges on his own; the
26  record here clearly reflects that the prosecutor in fact challenged Ms. Watkins on account of her
    underlying views on the criminal justice system.

1   non-responsive, somewhat bizarre, qualification if she did not perhaps possess a strong

2   sensitivity about the criminal justice system.  Also, Ms. Watkins did not report her brother's

3   situation in the question which called for whether a member of her family had been charged with

4   a crime, CR 1158,  but in the section which asked if a family member had been the *victim* of a

5   crime.  CR 1157.  She did, as the prosecutor indicated in court, state on the questionnaire that she

6   had problems with the criminal justice system but was "not sure" what they were.  CR 1160.

7           The judge initially questioned her about her brother's situation – a shooting

8   wherein he was convicted and served seven years.

9           Q.  Oh, well, then they found him guilty, all right.  *So I take it from*
            *the way you made this statement in here* that you and persons close
10          to you thought your brother acted in self-defense?
            A.  Yes.
11          Q.  And you were disappointed that the jury didn't see it that way?
            A.  Right.

12

13   RT 1333 (emphasis added)

14   Ms. Watkins did relate to the judge that her brother's experience would not affect her in the trial

15   and that she could deal with the facts of this case.  RT 1334.  She reiterated this belief in

16   questioning by defense counsel.  RT 1356.

17           The prosecutor challenged her for cause, RT 1361-62, asserting his then fresh

18   belief that she could not be impartial "based upon her responses in the questionnaire and in court

19   relating this incident involving the shooting.  Clearly, she– it's her perception that law

20   enforcement was incorrect, that the jury verdict was incorrect."  The judge responded that

21   "obviously" she was concerned with the shooting incident, but that she had stated she would not

22   be prejudiced by that, and "I don't know that I can just say she's lying."  RT 1362.  The cause

23   challenge was denied.  The prosecutor later used a peremptory challenge for this juror, and

24   justified it with, *inter alia*, this same explanation.

25           In this habeas case, we are all handicapped by not being able to observe Ms.

26   Watkins' demeanor when she answered the questions.  However, there is enough indication in

31

the record that Ms. Watkins had clearly indicated her dissatisfaction with what happened to her

brother when combined with the responses in the questionnaire that an objective prosecutor

would probably challenge this person.

*Conclusion*

None of  prosecutor's primary reasoning for challenges were pretextual.  In the

alternative, even in the close cases of Tillman and Watkins, the challenged jurors were properly

challenged in the final analysis.  The claim of <u>Batson</u> violation should be denied.

ACCORDINGLY, pursuant to the initial Findings and Recommendations

discussing issues other than the <u>Batson</u> issue discussed here, and for the reasons discussed here

recommending a denial of the <u>Batson</u> issue, the undersigned recommends that the entire petition

be denied.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 10/31/07

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
cook2240.157